**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| MILLENNIA HOUSING MANAGEMENT, *et al.,* | |
| Plaintiffs, | Case No. 1:24-cv-02084 |
| v. | District Judge Bridget Meehan Brennan |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.,* | |
| Defendants. | |

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Branch Director

*/s/ Pardis Gheibi*
PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney; U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov
*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

I.    STATUTORY AND REGULATORY SCHEME ............................................. 3

II.   ENACTMENT OF SECTION 537 ................................................................. 5

III.  ADMINISTRATIVE ENFORCEMENT ......................................................... 7

IV.   RELEVANT FACTS AND PROCEDURAL HISTORY ................................. 8

ARGUMENT ................................................................................................... 10

I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS. ......................... 11

      A.   Plaintiffs are not likely to show that the Court has subject-matter
           jurisdiction over their Seventh Amendment claim. ............................. 11

           i.    First *Thunder Basin* factor ....................................... 12

           ii.   Second *Thunder Basin* factor ................................... 13

           iii.  Third *Thunder Basin* factor ..................................... 13

      B.   Plaintiffs are not likely to succeed on the merits of their claims. ......................... 14

           i.    Plaintiffs have waived their Seventh Amendment and Article III
                 claims. ................................................................... 14

           ii.   HUD's claims are not subject to Article III or the Seventh
                 Amendment under *Jarkesy*. ....................................... 19

                 a.   The claims fall under the public-rights exception ......................... 19

                 b.   Under *Jarkesy*, the Seventh Amendment does not apply
                      where, as here, the suit is equitable ................................ 23

                      1.   The remedies provided by Section 573 are
                           equitable ........................................................ 24

                      2.   Causes of action under Section 573 are not found in
                           common law ................................................... 25

II.      PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM. ........................... 27

III.     THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST
         INJUNCTIVE RELIEF. ................................................................................................ 28

CONCLUSION ..................................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*,
  511 F. App'x 398 (6th Cir. 2013) ........................................................................... 27

*Alpine Secs. Corp. v. Nat'l Secs. Clearing Corp.*,
  Case No. 2:23-cv-00782, 2024 WL 1011863 (D. Utah Mar. 8, 2024),
  *appeal filed*, No. 24-4027 (10th Cir. Mar. 8, 2024) ............................................... 14

*Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n*,
  430 U.S. 442 (1977) ............................................................................................ 19, 20

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
  598 U.S. 175 (2023) .......................................................................... 11, 12, 13, 28

*Blankenship v. Fin. Indus. Regul. Auth.*,
  Civ. A. No. 24-3003, 2024 WL 4043442 (E.D. Pa. Sept. 4, 2024) ............................ 11, 12, 13

*Carter v. Toyota Tsusho Am., Inc.*,
  529 F. App'x 601 (6th Cir. 2013) ........................................................................... 10

*Chau v. United States*,
  72 F. Supp. 3d 417 (S.D.N.Y. 2014), *aff'd*, 665 F. App'x 67 (2d Cir. 2016) ........................ 14

*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986) ............................................................................................... 15

*D.T. v. Sumner Cnty. Schs.*,
  942 F.3d 324 (6th Cir. 2019) ........................................................................... 27, 28

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*,
  756 F.3d 917 (6th Cir. 2014) .................................................................................. 10

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012) ................................................................................................... 13

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ......................................................................................... 11, 12

*Friendship Materials, Inc. v. Mich. Brick, Inc.*,
  679 F.2d 100 (6th Cir. 1982) .................................................................................. 27

*Geldermann, Inc. v. Commodity Futures Trading Commission*,
  836 F.2d 310 (7th Cir. 1987) .................................................................................. 17

*Granfinanciera, S.A. v. Nordberg*,
  492 U.S. 33 (1989) ..................................................................................... 19, 20, 25

*Huron Mountain Club v. U.S. Army Corps of Eng'rs*,
   545 F. App'x 390 (6th Cir. 2013) ..................................................... 27

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*,
   756 F.3d 917 (6th Cir. 2014)........................................................... 10

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
   103 F.4th 748 (10th Cir. 2024).......................................................... 28

*Loc. Lodge No. 1424 v. NLRB*,
   362 U.S. 411 (1960) ...................................................................... 29

*Maryland v. King*,
   567 U.S. 1301 (2012) .................................................................... 29

*McNeilly v. Land*,
   684 F.3d 611 (6th Cir. 2012)........................................................... 10

*Miranda v. Garland*,
   34 F.4th 338 (4th Cir. 2022)............................................................ 29

*Nexstar Media, Inc. Grp. v. NLRB*,
   ___F. Supp. 3d ___, 2024 WL 4127090 (N.D. Ohio Aug. 26, 2024).................... 12

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................................... 29

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
   584 U.S. 325 (2018) ...................................................................... 19

*Paine, Webber, Jackson & Curtis, Inc. v. Chase Manhattan Bank, N.A.*,
   728 F.2d 577 (2d Cir. 1984)............................................................ 17

*Renegotiation Bd. v. Bannercraft Clothing Co.*,
   415 U.S. 1 (1974) ........................................................................ 28

*Seaboard Lumber Co. v. U.S.*,
   903 F.2d 1560 (Fed. Cir. 1990)......................................................... 15

*SEC v. Jarkesy*,
   144 S. Ct. 2117 (2024) ............................................................. *passim*

*Seila Law, LLC v. Consumer Fin. Prot. Bureau*,
   591 U.S. 197 (2020) ...................................................................... 28

*St. John's United Church of Christ v. City of Chi.*,
   502 F.3d 616 (7th Cir. 2007)....................................................... 13, 14

*Starbucks Corp. v. McKinney,*
    144 S. Ct. 1570 (2024) ................................................................ 10

*Stern v. Marshall,*
    564 U.S. 462 (2011) ................................................................... 22

*Stryker Emp. Co., LLC v. Abbas,*
    60 F.4th 372 (6th Cir. 2023) ...................................................... 10

*Thomas v. Union Carbide Agr. Prods. Co.,*
    473 U.S. 568 (1985) ................................................................... 16

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ........................................................... *passim*

*Tull v. United States,*
    481 U.S. 412 (1987) ......................................................... 24, 25, 26

*United States v. Wunderlich,*
    342 U.S. 98 (1951) ................................................................ 15, 16

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................... 10

*Yapp USA Auto. Sys., Inc. v. NLRB,*
    ___F. Supp. 3d___, 2024 WL 4119058 (E.D. Mich. Sept. 9, 2024),
    *appeal filed*, No. 24-1754 (6th Cir. Sept. 9, 2024) .................. 11, 12, 13

## STATUTES

12 U.S.C. §§ 1701, *et seq.*.......................................................... 3

12 U.S.C. § 1701t.................................................................... 3, 29

12 U.S.C. § 1713......................................................................... 3

12 U.S.C. § 1715c....................................................................... 4

12 U.S.C. § 1715k...................................................................... 20

12 U.S.C. § 1715*l*...................................................................... 3

12 U.S.C. § 1715n....................................................................... 3

12 U.S.C. § 1715z-1a.................................................................. 25

12 U.S.C. § 1735f-15........................................................... *passim*

Federal Housing Administration,
Pub. L. No. 73-479, 48 Stat. 1246 (1934) ................................................................ 3

Department of Housing and Urban Development Reform Act of 1989,
Pub. L. No. 101-235, 103 Stat. 1987 ...................................................................... 5

**REGULATIONS**

24 C.F.R. Part 5 Subpart G ...................................................................................... 4

24 C.F.R. Part 5 Subpart H ...................................................................................... 4

24 C.F.R. § 30, *et seq* ............................................................................................ 7

24 C.F.R. § 26.52 .................................................................................................... 8

24 C.F.R. § 30.45 ............................................................................................ *passim*

24 C.F.R. § 30.70 .................................................................................................... 7

24 C.F.R. § 30.80 .................................................................................................. 24

24 C.F.R. § 30.85 .................................................................................................... 7

24 C.F.R. § 30.90 .................................................................................................... 8

24 C.F.R. § 30.95 .................................................................................................... 8

Adjustment of Civil Monetary Penalty Amounts for 2024,
89 Fed. Reg. 13,614 ................................................................................................ 5

**UNITED STATES CONSTITUTION**

U.S. CONST. AMEND. VII ........................................................................................ 18

**OTHER AUTHORITIES**

Darryl E. Getter, *Multifamily Housing Finance and Selected Policy Issues*, CONG. RES. SERV.
REPORT R46480 (Updated Mar. 8, 2023),
https://crsreports.congress.gov/product/pdf/R/R46480 ...................................... 4, 21

Frank T. Sinito – *The Millennia Companies*,
https://themillenniacompanies.com/frank-t-sinito/ .................................................. 8

*HUD Reform: Hearing before the Subcomm. on Hous. & Cmty. Dev. of the H. Comm. on
Banking, Fin. & Urb. Affs.*, 101st Cong. (1989) ........................................... 6, 7, 22

Nat'l Multifamily Hous. Council, *FHA Multifamily and the Apartment Industry Fact Sheet*,
    https://www.nmhc.org/advocacy/issue-fact-sheet/fha-multifamily-and-the-apartment-
    industry-fact-sheet .................................................................................................................. 4

## INTRODUCTION

Consistent with its authority to administratively enforce and adjudicate public rights, the Department of Housing and Urban Development ("HUD") is pursuing a consolidated enforcement proceeding against Plaintiffs Frank Sinito and his affiliated entities, which develop, own, and manage multifamily housing projects across the country ("Plaintiffs"). HUD's administrative claims, which are pending before the agency's Office of Hearings and Appeals ("OHA"), allege that Plaintiffs violated the prohibition on unauthorized use of government-insured loans under Section 537 of the National Housing Act, 12 U.S.C. § 1735f-15(c) ("Section 537"); its corresponding regulatory requirement; and the terms of multiple Regulatory Agreements between Plaintiffs and HUD.

Plaintiffs, in an effort to short-circuit that administrative proceeding, bring this preliminary-injunction motion. They argue that the proceeding before OHA should be immediately enjoined because HUD's claims are "legal" in nature, and therefore subject to a jury trial and adjudication by an Article III court in the first instance, rather than upon conclusion of proceedings before the agency, under *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024). This Court should deny Plaintiffs' motion because they have failed to show that the factors governing the issuance of preliminary injunctive relief support the extraordinary relief they seek.

Plaintiffs fail to satisfy the first factor—a showing of likelihood of success on the merits of their claims—for several reasons. *First*, this Court lacks subject-matter jurisdiction over Plaintiffs' Seventh Amendment claim. Section 537 contains a special-jurisdiction provision that expressly channels review over such claims through review at the agency and then in a U.S. Court of Appeals. This provision applies with full force to Plaintiffs' Seventh Amendment claim here because it is "of the type" that Congress subjected to the special-review provisions. *See Thunder*

*Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994). For this reason, Plaintiffs cannot show a likelihood of success on the merits of that claim, as needed to obtain emergency relief.

*Second*, even if the Court determines that it has jurisdiction over one or more of Plaintiffs' claims, it should deny Plaintiffs' motion because they have waived any right to a jury trial or Article III adjudication by entering into contracts with HUD that channel the adjudication of HUD's claims through administrative proceedings.

*Third*, even were the Court to conclude that Plaintiffs have not waived their constitutional challenges, it should nevertheless deny their preliminary injunction motion because HUD's claims against them fall under the public-rights exception because they arise out of a "novel" affordable housing regulatory scheme. *Jarkesy*, 144 S. Ct. at 2137.

*Fourth*, if the Court rejects the application of the public-rights exception, Plaintiffs still fail to show likelihood of success because they cannot show that under *Jarkesy*'s two-prong test, HUD's claims are legal, as opposed to equitable, in nature. As for *Jarkesy*'s first prong (nature of the remedies), HUD's claims—which consider factors such as the violator's ability to pay the penalty, injury to the public, injury to the tenants, and injury to the lot owners—are distinguishable from the remedies the Supreme Court characterized as purely punitive in *Jarkesy*. The second prong—the relationship between the cause of action under Section 537 and common law—also supports finding that HUD's claims are equitable. HUD's claims arise out of a unique affordable housing regulatory scheme created by Congress in the 1930s; as such, no common-law analogue to such claims existed in the 18th Century.

Moreover, the other preliminary injunction factors independently compel denial of injunctive relief. Plaintiffs fail to show irreparable harm for several reasons. *First*, their own delay in seeking relief illustrates the lack of urgency. *Second*, Plaintiffs' alleged harms—denial of a right

to a jury trial and Article III adjudication—fail on the substance because they are unlikely to show that either the Seventh Amendment or Article III are implicated by the administrative adjudication. *Third*, even if they could make that showing as to either of their claims, any harm would not be irreparable because if Plaintiffs were to prevail on their claims, any remedy granted to HUD by OHA could be vacated after the fact.

Finally, the balance of the equities and public interest weigh against an injunction. There is compelling public and Government interest in enforcing the prohibition against unauthorized use of government funds under the statutory housing programs HUD administers—which not only protect the public fisc but also enforce the overarching statutory goals of the National Housing Act to provide affordable housing. An injunction would hinder Congress's mandate to HUD to enforce these protections in a timely and orderly fashion.

## BACKGROUND

### I. STATUTORY AND REGULATORY SCHEME

In 1934, Congress, concerned with the declining national stock of affordable housing, enacted the National Housing Act. 12 U.S.C. §§ 1701, *et seq*. The Act was passed to ensure that every American family has a decent home and a suitable living environment. *See id.* § 1701t. The Act created the Federal Housing Administration ("FHA"), which is now a component of HUD, and included two programs: Section 203 and Section 207. Pub. L. No. 73-479 §§ 204, 207, 48 Stat. 1246, 1249, 1252 (1934). Section 203 insured lenders against losses on single-family homes, and Section 207 provided insurance on large-scale rental projects for low-income individuals. *Id.* Since that time, Congress has created additional insurance programs to encourage the construction of affordable multifamily housing. *See, e.g*., 12 U.S.C. §§ 1713, 1715*l*, 1715n.

By insuring lenders against the risk of loss from mortgage defaults, HUD's multifamily insurance programs can increase the amount of capital available to borrowers ("mortgagors") to build, rehabilitate, purchase, and refinance multifamily rental housing with more favorable interest rates and other terms than would otherwise be available. As a result, FHA-insured loans "can encourage investment in higher-risk properties in underserved areas," in part "by reducing developers' financing costs and assuming some or all of the interest rate risks that otherwise would be borne by lenders." Darryl E. Getter, *Multifamily Housing Finance and Selected Policy Issues*, Cong. Res. Serv. Report R46480 (Updated Mar. 8, 2023) at 10, https://crsreports.congress.gov/product/pdf/R/R46480 ("Getter"). These mortgages "can help sustain profitability of various multifamily projects that otherwise might be bypassed due to the higher financing costs." *Id.* As an industry trade association has noted, "FHA lending is essential to . . . affordable housing developers" because FHA-insured loans provide "a material and important source of capital for underserved segments of the rental market." Nat'l Multifamily Hous. Council, *FHA Multifamily and the Apartment Industry Fact Sheet*, https://www.nmhc.org/advocacy/issue-fact-sheet/fha-multifamily-and-the-apartment-industry-fact-sheet/ (last visited Jan. 7, 2025).

With these benefits come certain requirements. Specific statutes and regulations impose new restrictions and conditions on lenders, mortgagors, and properties subject to FHA-insured mortgages, which serve to protect the FHA-insurance fund as well as to advance particular policy goals that Congress has enacted into law. *See, e.g.*, 24 C.F.R. Part 5 Subparts G & H (setting forth requirements for physical conditions and financial reporting for properties with certain types of FHA-insured mortgages); 12 U.S.C. § 1715c (requiring compliance with federal prevailing-wage standards under the Davis-Bacon Act as a condition for obtaining certain types of FHA mortgage

insurance). Mortgagors also enter into Regulatory Agreements with HUD, under which the mortgagor explicitly agrees to comply with certain requirements, some of which reiterate statutory and regulatory provisions, while others state additional obligations. *See, e.g.*, Compl. Ex. A, Exemplar Regulatory Agreement ¶ 6(b), Dkt. No. 1-1 (mirroring a statutory prohibition); *id.* ¶¶ 6(e), (f) (imposing additional restrictions). Mortgagors and their management agents also execute Project Owner's/Management Agent's Certifications ("POMAC"), in which they certify that they "will comply with HUD requirements and contract obligations," and acknowledge that "HUD may seek additional civil money penalties to be paid by mortgagor through personal funds for: . . . [c]ertain specific violations of the Regulatory Agreement, the penalties could be as much as $25,000 per occurrence (12 U.S.C. 1735f-15)."[1] *See, e.g.*, Cherry Estates LP & Cherry Estates Investment LLC POMAC, at 1-2 ("Exhibit A").

## II.   ENACTMENT OF SECTION 537

Plaintiffs here challenge HUD's authority to impose, through an administrative process, civil money penalties against mortgagors and certain other closely related parties responsible for multifamily properties with FHA-insured mortgages. This authority derives from Section 537 of the Act. As relevant here, Section 537 provides that HUD may impose a civil money penalty on a mortgagor or closely related party "that knowingly and materially" engages in "[a]ssignment, transfer, disposition, or encumbrance of any personal property of the project, including rents, other revenues, or contract rights, or paying out any funds, except for reasonable operating expenses and necessary repairs, without the prior written approval of the Secretary." 12 U.S.C. § 1735f-15(c)(1)(B)(ii). As described below, HUD has used this authority to protect the public and public

---

[1] The current penalty amount adjusted for inflation is $61,238 per occurrence. *See* Adjustment of Civil Monetary Penalty Amounts for 2024, 89 Fed. Reg. 13,614 (Feb. 23, 2024).

funds for more than three decades, using hearing procedures that provide respondents with several opportunities to present evidence and arguments before the imposition of a penalty, which is subsequently subject to direct review by an appropriate court of appeals following a final agency decision. *See* 12 U.S.C. § 1735f-15(e)(1).

Congress enacted the original version of Section 537 as part of the Department of Housing and Urban Development Reform Act of 1989, Pub. L. No. 101-235, 103 Stat. 1987. In response to several high-profile scandals involving HUD programs, the agency asked for and received statutory authority to bring administrative actions for civil money penalties that would fill the gaps left by other statutes. *See HUD Reform: Hearing before the Subcomm. on Hous. & Cmty. Dev. of the H. Comm. on Banking, Fin. & Urb. Affs.*, 101st Cong. at 1-2, 107-08 (1989).

Before its passage, HUD had limited options for sanctioning violators, options which HUD contended had "a more adverse effect on the Department and the tenants than on the mortgagor." *Id.* at 261 (Legislative Proposal Attached to Letter from Secretary Jack Kemp to Speaker Thomas S. Foley). Before 1989, if a mortgagor violated HUD's requirements, the principal remedies were to declare the mortgage in default and to debar the mortgagor. *Id.* at 107, 261. But taking these steps could result in HUD foreclosing on the property at a loss and paying an insurance claim to the lender, while the property itself would "deteriorate[] physically and financially, with the consequent reduction in services to tenants." *Id.* at 261. Alternatively, HUD could ask the Department of Justice to bring a criminal action, but only if the conduct constituted a criminal offense, could be proved beyond a reasonable doubt, and warranted sufficient prosecutorial resources. *See id.* at 107, 262. A civil action under the False Claims Act or the Program Fraud Civil Remedies Act might also vindicate HUD's requirements, but only for the subset of violations that involved a false claim or false certification. *Id.* at 262.

-6-

HUD's summary of the reform package illustrated the problem with an FHA-insured property that fell into severe disrepair after years of neglect. The agency explained that the former all-or-nothing enforcement scheme prevented HUD from taking early action to halt the property's decline. *Id*. at 107 ("Reform of HUD Under President George Bush and Secretary Jack Kemp: Clearing the Decks"). Conversely, it argued, agency-imposed fines would have "economically forced the owners and managers to take one of two actions: either make the necessary repairs, or default," which would enable HUD to bring in a more responsible owner *before* the property had "deteriorated to the point of being worthless." *Id*. at 108.

## III.  ADMINISTRATIVE ENFORCEMENT

Under the current version of Section 537, "[t]he Secretary shall establish standards and procedures governing the imposition of civil money penalties" that "shall provide for the Secretary or other department official . . . to make the determination to impose a penalty . . . only after [a respondent] has been given an opportunity for a hearing on the record[.]" 12 U.S.C. § 1735f-15(d)(1), Federal agency adjudications "on the record" are subject to the Administrative Procedure Act (APA). HUD has promulgated regulations governing its civil money penalty actions, at 24 C.F.R. § 30, *et seq*.

Under these regulations, before HUD imposes a civil money penalty, it must first issue a "Prepenalty Notice" to a potential respondent, advising that HUD is considering seeking civil money penalties, identifying specific alleged violations and the maximum potential penalty, and inviting the submission of a response within 30 days for the agency to consider before any complaint is filed. *See* 24 C.F.R. § 30.70. After the 30-day response period, HUD may file a complaint that sets forth the factual and legal basis for the penalty, states the amount sought, and informs the respondent of its right to request a hearing in writing within 15 days. *Id*. § 30.85. If

the respondent requests a hearing, it must submit an answer to the complaint, and the proceeding before the Administrative Law Judge (ALJ) begins. *Id*. §§ 30.90, 30.95. Either party can appeal the ALJ's determination to the Secretary. *Id*. § 26.52(a), (k); *see also* 12 U.S.C. § 1735f-15(d)(1)(C). After exhausting these administrative remedies, judicial review is available to the penalized party who may seek review of the final agency action in the appropriate federal court of appeals. *Id*. § 1735f-15(e).

## IV.  RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiff Frank Sinito and his affiliated entities develop, own, and manage multifamily housing projects across the country. Doing business as the Millennia Companies, Sinito's enterprise has over 200 properties in its portfolio. *See* Frank T. Sinito – *The Millennia Companies*, https://themillenniacompanies.com/frank-t-sinito/ (last visited Jan. 7, 2025). Many of these properties have FHA-insured mortgages and other HUD contracts, including all 16 involved in the challenged administrative action. These properties are all managed by Plaintiff Millennia Housing Management, Ltd., and owned by single-asset entities in which Sinito has a direct or indirect ownership stake. Each of the remaining plaintiffs is either the mortgagor-owner entity of one of these properties or a partner in a mortgagor-owner entity. Compl. ¶ 49, Dkt. 1.

The administrative action arose from a 2023 HUD review of bank statements and other financial documents in Plaintiffs' files relating to a selection of Millennia properties subject to HUD contracts. *See, e.g.,* Pls.' Mot. for a Prelim. Inj. ("Pls. Br.") Ex. B, Admin. Compl. ("Admin. Compl.") ¶ 29, Dkt. No. 3-2. HUD identified numerous potential violations of statutory and regulatory requirements at the 16 properties at issue, including repeated violations of the prohibition on "paying out any funds, except for reasonable operating expenses and necessary repairs, without the prior written approval of the Secretary." 12 U.S.C. § 1735f-15(c)(1)(B)(ii).

HUD concluded that each transaction improperly removed funds from a particular property, in most cases diverting them to some other entity affiliated with Sinito and The Millennia Companies. *See, e.g.,* Admin. Compl. ¶¶ 53, 55.

HUD therefore issued letters to each property in November of 2023 demanding repayment of the misappropriated funds. The next month, HUD issued a Pre-Penalty Notice for each property, as required by its regulations. *Id.* ¶ 13. Finally, from February through April of 2024, HUD filed and served 16 administrative complaints, which alleged specific details about each of 119 financial transactions alleged to have violated the statutory prohibition.[2] In total, HUD alleged that Plaintiffs took $3,313,909 out of the properties' accounts without authorization between January 2022 to April 2023. The complaints explained that these improper transactions were material to HUD "because the distributions placed the Project at financial risk" and HUD's decision to insure the mortgages relied upon HUD's statutory and contractual rights to approve all distributions to ensure they "would not deprive the Project of needed assets or render it insolvent." *Id.* ¶¶ 34-36.

These complaints triggered the current administrative proceedings before OHA. The ALJ consolidated these actions into a single proceeding on May 2, 2024. Plaintiffs filed initial answers to each of the complaints on May 22, none of which raised a defense based on Article III or the Seventh Amendment. Plaintiffs later sought and received permission to file amended answers to add that defense, which they did on August 1.

The ALJ initially set the consolidated matter for an in-person oral hearing to commence on December 2, 2024. Plaintiffs, with HUD's consent, later moved to extend the discovery period and postpone the hearing until March 3, 2025, which the ALJ granted. Following the execution of

---

[2] HUD also alleges the transactions also violated a corresponding regulatory provision, 24 C.F.R. § 30.45(c), as well as each project's Regulatory Agreement. *See, e.g.*, Admin. Compl. ¶¶ 30, 35, 36, 63 & Prayer for Relief ¶ 69.

criminal search warrants against Millennia's CEO, Frank Sinito, on November 1, 2024, Plaintiffs sought to stay the administrative proceeding pending the outcome of the criminal investigation, which the ALJ denied on November 22, 2024. In the interim, both sides have begun to make rolling productions of documents responsive to discovery requests.

## ARGUMENT

A plaintiff may obtain the "extraordinary remedy" of a preliminary injunction only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In evaluating a motion for a preliminary injunction, this Court must consider: "(1) the movant's likelihood of success on the merits;[3] (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). Plaintiffs' Seventh Amendment and Article III adjudication claims fail the above standard.[4]

---

[3] Notably, with respect to the first factor, Plaintiffs argue that "'it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for litigation.'" Pls. Br. 9 (quoting *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 385 (6th Cir. 2023)). But as the Supreme Court confirmed this past Term, the movant must "make a clear showing that it is likely to succeed on the merits." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1575 (2024) (citation omitted). Granting injunctive relief under a lesser standard—such as "reasonable cause to believe" or "substantial and not frivolous"—would constitute a "watered-down approach to equity." *Id.* at 1578.

[4] In addition to these two claims, in a footnote, Plaintiffs assert that the for-cause removal restrictions of HUD ALJ's amount to another structural constitutional violation. *See* Pls. Br. at 1 n.4. But Plaintiffs do not identify this challenge as a basis for their request for a preliminary injunction. *See, e.g., id.* at 16 (basing their irreparable-harm claim solely on their "Seventh Amendment rights and their right to have their dispute heard by an Article III court"). But regardless, "[b]ecause Plaintiffs fail to develop this argument further than this footnoted reference, it is forfeited." *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 932 (6th Cir. 2014); *see also Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 612 n.2 (6th Cir. 2013) ("Generally, an argument raised in a footnote without further development is deemed waived."). Because in this current posture, this claim is not properly before the Court, the Defendants do not address its merits, but reserve the right to do so at a later stage.

I.    **PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.**

   A.    **Plaintiffs are not likely to show that the Court has subject-matter jurisdiction over their Seventh Amendment claim.**

Section 537 contains a special-review provision under which "[j]udicial review of agency determination" is channeled directly to the appropriate U.S. Court of Appeals. 12 U.S.C. § 1735f-15(e)(1). As the Supreme Court has explained, review schemes that provide for direct judicial review in the U.S. Court of Appeals following administrative adjudication are "typical[]," and "divest[] district courts of their ordinary jurisdiction over the covered cases." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 185 (2023). Under such review schemes, the district court may only exercise jurisdiction if it concludes that plaintiffs' claims are not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin*, 510 U.S. at 212. To answer this question, the Court must consider the three *Thunder Basin* factors: (1) whether preclusion of review would "foreclose all meaningful judicial review"; (2) whether "the suit is 'wholly collateral to [the] statute's review provisions'"; and (3) whether "the claims are 'outside the agency's expertise.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212–13).

Plaintiffs, by analogizing this suit to *Axon*, argue that this suit satisfies the *Thunder Basin* factors. This analogy is misguided. In *Axon*, the Supreme Court examined the *Thunder Basin* factors and concluded that plaintiffs' constitutional challenges to the structure and existence of the SEC and the FTC are not "of the type" that Congress envisioned would fall within the statutes' special-review schemes. *Axon*, 598 U.S. at 185–96. Thus, it concluded that the district court had jurisdiction over those claims. *Id*.

As several district courts have recently recognized, however, similar post-*Jarkesy* Seventh Amendment claims do not satisfy the *Thunder Basin* factors and are wholly distinct from the

-11-

structural constitutional claims in *Axon*. *See, e.g., Yapp USA Auto. Sys., Inc. v. NLRB*, ___F. Supp. 3d___, 2024 WL 4119058, at *10–12 (E.D. Mich. Sept. 9, 2024), *appeal filed*, No. 24-1754 (6th Cir. Sept. 9, 2024); *Blankenship v. Fin. Indus. Regul. Auth.*, Civ. A. No. 24-3003, 2024 WL 4043442, at *2–3 (E.D. Pa. Sept. 4, 2024); *Nexstar Media, Inc. Grp. v. NLRB*, ___ F. Supp. 3d ___, 2024 WL 4127090, at *2–5 (N.D. Ohio Aug. 26, 2024). This Court should follow suit.

       i.     <u>First *Thunder Basin* factor</u>

As for the first factor, precluding judicial review in the district court would not foreclose meaningful judicial review of Plaintiffs' Seventh Amendment claim. This claim challenges the remedies sought by HUD in the administrative proceedings. *See YAPP*, 2024 WL 4119058, at *11 (explaining that plaintiff's post-*Jarkesy* "Seventh Amendment claim is a challenge to the remedies being sought in the administrative proceeding."). If those proceedings conclude with an order imposing remedies, Plaintiffs can seek review before the Sixth Circuit, which could vacate any grant of legal remedies should Plaintiffs prevail. By contrast, the plaintiff in *Axon* alleged "that the FTC's internal proceedings were unconstitutional in their *entirety*." *Blankenship,* 2024 WL 4043442, at *2 (emphasis added) (summarizing *Axon*'s holding). The Supreme Court concluded that the structural-constitutional claims raised in *Axon* were a "here-and-now injury"—namely, merely being subject to the proceeding of an agency that plaintiff challenged as unconstitutional caused an injury that could not be remedied following review in the U.S. Court of Appeals. *Axon*, 598 U.S. at 195; *see also Free Enter. Fund*, 561 U.S. at 489–90 (concluding that the district court had jurisdiction over a structural-constitutional challenge to the Public Company Oversight Board under the SEC). Plaintiffs' Seventh Amendment claim raises no such structural-constitutional argument that would render the ALJ proceeding itself a constitutional violation. *See Blankenship*, 2024 WL 4043442, at *2 (plaintiff's alleged Seventh Amendment injury under *Jarkesy* "are not

'here-and-now' because they do not arise merely from his appearance in FINRA's proceeding");
*YAPP*, 2024 WL 4119058, at *11 (Seventh Amendment challenge is not "a structural challenge attacking the very nature of the agency" (citation omitted)).

ii.      Second *Thunder Basin* factor

As for the second factor, Plaintiffs' Seventh Amendment claim is not "wholly collateral" to the statutes' review provisions. *Axon*, 598 U.S. at 186 (citation omitted). To the contrary, the Seventh Amendment is "the vehicle by which [Plaintiffs] seek to" challenge a potential future decision by the agency regarding the remedies that may be granted at the conclusion of the OHA proceedings. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012); *see also YAPP*, 2024 WL 4119058, at *12 (Seventh Amendment challenge to ALJ proceeding precluded under *Thunder Basin* because "determining what type of remedies are appropriate or permissible under the [statute] is not 'wholly collateral' to the functioning of the [agency]"); *Blankenship*, 2024 WL 4043442, at *3 (Seventh Amendment "claims are not wholly collateral because they do not challenge [the agency's] existence, but instead depend on [the agency's] proceedings and the interpretation of its rules").

iii.      Third *Thunder Basin* factor

As for the third factor—whether the agency has the expertise to address Plaintiffs' claim—Plaintiffs' claim does not exist in a vacuum. Instead, it is "intertwined with or embedded in matters on which [HUD has] expert[ise]." *Axon*, 598 U.S. at 195. The subject matter of the administrative proceeding—violation of the requirements of an FHA-insured mortgage—falls "squarely within [HUD]'s expertise." *Elgin*, 567 U.S. at 23. As was the case in *Elgin*, if OHA rules in Plaintiffs' favor on the threshold issue of unauthorized use of funds, it "would avoid the need to reach [the] constitutional claim[]." *Id*. By contrast, neither *Axon* nor *Free Enterprise* presented any threshold

-13-

issues that were intertwined with the structural-constitutional claims, which went beyond any "enforcement-related matters." *Axon*, 598 U.S. at 204.

Moreover, permitting Plaintiffs to "bypass the administrative process" would require this Court to decide "constitutional issues . . . devoid of factual context." *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 629 (7th Cir. 2007) (citation omitted). Accordingly, "*Thunder Basin* and *Free Enterprise* . . . militate against jurisdiction when a pre-enforcement constitutional claim relates to factual issues that are the subject of a pending administrative adjudication." *Chau v. United States*, 72 F. Supp. 3d 417, 426 (S.D.N.Y. 2014), *aff'd*, 665 F. App'x 67 (2d Cir. 2016).

Lastly, even if HUD lacks the expertise to address Plaintiffs' claim, that is of no moment because the claim can be adequately reviewed by the Sixth Circuit. Indeed, in *Thunder Basin*, the Court reasoned that regardless of the agency's expertise in addressing the constitutional claims, those claims "can be meaningfully addressed in the Court of Appeals." *Thunder Basin*, 510 U.S. at 215; *see also Alpine Secs. Corp. v. Nat'l Secs. Clearing Corp.*, Case No. 2:23-cv-00782, 2024 WL 1011863, at *5 (D. Utah Mar. 8, 2024) (reasoning under *Thunder Basin*'s third factor, that even if the agency has "no experience addressing similar Due Process claims, 'petitioner's statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals'" (quoting *Thunder Basin*, 510 U.S. at 215), *appeal filed*, No. 24-4027 (10th Cir. Mar. 8, 2024)). In sum, all three *Thunder Basin* factors illustrate that the statutory special review provision applies to Plaintiffs' claims, and the suit must be dismissed for lack of jurisdiction.

**B.  Plaintiffs are not likely to succeed on the merits of their claims.**

Even if the Court determines that it has jurisdiction over one or more of Plaintiffs' claims, it should nevertheless deny Plaintiffs' motion because Plaintiffs are unlikely to succeed on the merits of their Seventh Amendment and Article III claims.

-14-

i.    <u>Plaintiffs have waived their Seventh Amendment and Article III claims.</u>

Plaintiffs have failed to show a likelihood of success on the merits because—even assuming HUD's claims are subject to a trial by a jury or Article III adjudication—Plaintiffs have waived any such right. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848-49 (1986) (listing the right to adjudication in an Article III court as well as the right to a civil jury trial among the waivable constitutional rights).[5]

Specifically, each of the 16 properties at issue are subject to a separate Project Owner's/Management Agent's Certification ("POMAC"), all of which contain the following language: "HUD may seek additional civil money penalties to be paid by mortgagor through personal funds for: . . . [c]ertain specific violations of the Regulatory Agreement, the penalties could be as much as $25,000 per occurrence (12 U.S.C. 1735f-15)." *See, e.g.*, Exhibit A, at 2.[6]

---

[5] Plaintiffs also allege that the administrative proceeding "violates the separation of powers by usurping Article III's Judicial Power." Pls. Br. at 6. Separation of powers—if implicated—is not a waivable claim. *Schor*, 478 U.S. at 850-51. But Plaintiffs fail to raise this argument in any meaningful way. Indeed, the three relevant mentions of "separation of powers," appear in conclusory sentences. Pls. Br. at 1, 6, 17. Substantively, Plaintiffs' Article III claim pertains to their alleged right to "an impartial and independent federal adjudication," which "is subject to waiver." *Schor*, 478 U.S. at 849. And, as explained below, Plaintiffs have waived this alleged right. Plaintiffs cannot circumvent waiver by masquerading their claim for Article III adjudication as a separation-of-powers claim. Besides, as explained below, even assuming Plaintiffs have raised an independent separation-of-powers claim, that claim fails under the public-rights exception. *See infra* I.B(ii)(a).

[6] The following twenty-one Plaintiffs have executed POMACs with HUD: Frank T. Sinito; Millennia Housing Mgmt Ltd.; Cherry Estates LP; Cherry Estates Investment, LLC; Highland Place Associates I, Ltd.; Petosky Riverview LDHA LP; Hunter's Run Investment, LLC; Halton HR Investors, LLC; Hickory Creek Estates, Ltd.; International Towers I Ohio, Ltd.; Bethel Tower LDHA LP; Trail West, Ltd.; Covenant Apartments LP; Covenant Apartments Investment, LLC; Sherman Thompson OH, TC LP; Robinson Heights Apartments I, LP; Oakdale Estates Investment LLC; Oakdale Estates II Investment, LLC; Kingsbury Tower I, Ltd.; Flushing Elmcrest LDHA LP; and Morning Star Tower, Ltd.
*See* attached POMACs as Exhibits: Highland Place Associates I, Ltd. POMAC ("Exhibit B"); Petosky Riverview LDHA LP POMAC ("Exhibit C"); Hunter's Run Investment, LLC & Halton HR Investors, LLC POMAC ("Exhibit D"); Hickory Creek Estates, Ltd. POMAC ("Exhibit E"); International Towers I Ohio, Ltd. POMAC ("Exhibit F"); Bethel Tower LDHA LP POMAC

"Government contractors long have been held to be bound by a provision vesting dispute resolution in a nonjury/non-Article III forum." *Seaboard Lumber Co. v. U.S.*, 903 F.2d 1560, 1564 (Fed. Cir. 1990). For example, in *United States v. Wunderlich*, the Court held that the standard government contract, which included a provision outlining administrative adjudication, amounted to a waiver of Article III adjudication. 342 U.S. 98, 99–101 (1951); *see also Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 592 (1985) (holding that the plaintiff's registration submission, which included an acknowledgment that it will be bound by the statute's arbitration provision, amounted to an "explicit[] consent[] to have his rights determined by arbitration").

Similarly, here, as government contractors, twenty-one of the Plaintiffs executed POMACs with HUD and agreed to be subject to the penalties outlined in Section 537. As such, this Court should rule that the twenty-one Plaintiffs that have executed POMACs with HUD have expressly waived any right to a jury trial and Article III adjudication.

Ten of the remaining Plaintiffs,[7] have similarly waived their rights to a jury trial and Article III adjudication by entering into Regulatory Agreements, which include the following general obligations: mandating that "[b]orrower shall comply with all applicable: laws; ordinances; regulations; requirements of any Governmental Authority"; providing that "HUD shall be entitled to invoke any remedies available by law to redress any breach or to compel compliance by

---

("Exhibit G"); Trail West, Ltd. POMAC ("Exhibit H"); Covenant Apartments LP & Covenant Apartments Investment, LLC POMAC ("Exhibit I"); Sherman Thompson OH, TC LP POMAC ("Exhibit J"); Robinson Heights Apartments I, LP POMAC ("Exhibit K"); Oakdale Estates Investment LLC POMAC ("Exhibit L"); Oakdale Estates II Investment, LLC POMAC ("Exhibit M"); Kingsbury Tower I, Ltd. POMAC ("Exhibit N"); Flushing Elmcrest LDHA LP POMAC ("Exhibit O"); Morning Star Tower, Ltd. POMAC ("Exhibit P").

[7] Bethel Tower Investment, LLC; Robinson Heights Apartments Investment I, LLC; Elmcrest Investment, LLC; Halton Springs Investments, LLC; International Tower Investment I, LLC; Morning Star Tower Investment, LLC; Oakdale Estates Investment GP, LLC; Oakdale Estates, Ltd.; Petoskey Riverview Investment, LLC; and, Kingsbury Tower Investment I, LLC.

Borrower with these requirements, including any remedies available hereunder"; and, defining "Program Obligations" as "all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project . . . ." *See, e.g*., Bethel Tower Investment, LLC Regulatory Agreement ("RA"), at 7, 26 ("Exhibit Q").[8]

Importantly, the fact that these Regulatory Agreements do not explicitly reference Section 537 or 24 C.F.R. § 30.45 is of no moment. For instance, in *Geldermann, Inc. v. Commodity Futures Trading Commission*, Geldermann voluntarily joined the Chicago Board of Trade (CBT) and agreed "to observe and be bound by the Charter, Rules and Regulations of the Association, and all amendments subsequently made thereto." 836 F.2d 310, 318 (7th Cir. 1987) (citation omitted). When CBT subsequently amended its rules to require arbitration, the court held that Geldermann's agreement to observe CBT's rules (albeit, generally) bound Geldermann to CBT's specific mandate to arbitrate even though no explicit waiver of an Article III adjudication appeared in the agreement. *Id.; see also Paine, Webber, Jackson & Curtis, Inc. v. Chase Manhattan Bank, N.A.*, 728 F.2d 577, 580 (2d Cir. 1984) ("[T]he arbitration provisions of the NYSE Constitution and Rules are sufficient in and of themselves to compel arbitration of covered disputes under § 3, whether or not they are incorporated in a purchase and sale agreement."). Similarly, here, by agreeing to be bound by the applicable statutes and regulations generally, the Plaintiffs that entered into the relevant Regulatory Agreements agreed to be bound by Section 537.

---

[8] *See* attached RAs as Exhibits: Robinson Heights Apartments I, LP & Robinson Heights Apartments Investment I, LLC RA ("Exhibit R"); Flushing Elmcrest LDHA LP & Elmcrest Investment, LLC RA ("Exhibit S"); Hunter's Run Investment, LLC & Halton HR Investors, LLC & Halton Springs Investments, LLC RA ("Exhibit T"); International Towers I Ohio, Ltd. & International Tower Investment I, LLC RA ("Exhibit U"); Morning Star Tower, Ltd. & Morning Star Tower Investment, LLC RA ("Exhibit V"); Oakdale Estates Investment GP, LLC & Oakdale Estates, Ltd. RA ("Exhibit W"); Petoskey Riverview Investment, LLC RA ("Exhibit X"); Kingsbury Tower Investment I, LLC RA ("Exhibit Y").

As for the remaining eight Plaintiffs[9] that have not entered into either a POMAC or a Regulatory Agreement that contains the above waivers, they have implicitly waived their rights by participating in the FHA-insured mortgage program. After all, Section 537 itself makes clear that those who benefit from the program are subject to civil money penalties in accordance with Section 537. *See* 12 U.S.C. § 1735f-15(c)(1)(A) (identifying the "[l]iable parties" as including "any general partner of a partnership mortgagor of such property" and "any member of a limited liability company that is the mortgagor of such property or the general partner of a limited partnership mortgagor," among others). As such, by voluntarily participating in the FHA-insured mortgages program, the remaining Plaintiffs knowingly subjected themselves to Section 537. Notably, all Plaintiffs are controlled by Frank T. Sinito and Millennia Housing Mgmt Ltd. who are veteran HUD contractors with ample knowledge about the relevant statutory and regulatory requirements. *See* Admin. Compl. ¶ 47 ("Frank Sinito and Millennia have ownership interests in over two hundred HUD assisted multifamily properties."). The interconnected nature of Plaintiffs' businesses illustrates that all Plaintiffs participated in—and benefited from—the relevant government programs with the knowledge of their statutory obligations under Section 537.

Thus, the Court should hold that all Plaintiffs, either explicitly or implicitly, waived any right to a jury trial or Article III adjudication as a condition of participation in the applicable government programs. If the Court concludes, however, that only the Plaintiffs that have entered into POMACs or Regulatory Agreements have waived their rights, it should uphold the waiver with respect to those Plaintiffs and allow HUD to continue its administrative adjudication of the relevant claims with respect to those Plaintiffs.

---

[9] Covenant Project, LLC; Trail West Investment, LLC; Trail West Housing Partners, Inc.; Hickory Creek Estates Investment, LLC; Sherman Thompson Towers Investment, LLC; Highland Place Investment I, LLC; YMHA Housing Preservation, LLC; and, HWFB HR Investment, LLC.

-18-

ii.     HUD's claims are not subject to Article III or the Seventh Amendment under *Jarkesy.*

If the Court concludes that Plaintiffs did not waive any Seventh Amendment or Article III rights, and thereby finds it necessary to reach the substance of Plaintiffs' claims, it should nevertheless deny Plaintiffs' motion because HUD's claims are not subject to the Seventh Amendment or Article III adjudication under *Jarkesy*.

The Seventh Amendment preserves the "right of trial by jury" in "suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. Amend. VII. This right, however, only "extends to a particular statutory claim if the claim is 'legal in nature.'" *Jarkesy*, 144 S. Ct. at 2128 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)). In *Jarkesy*, the Court identified two factors that determine whether a suit is "legal in nature": (1) "the remedy" and (2) "the cause of action." *Id.* at 2129. In doing so, however, the Court also reaffirmed that, under the "public rights" doctrine, "Congress may assign [a] matter for [an initial] decision to an agency without a jury," consistent with the Seventh Amendment and Article III, even when "the judicial power" is "capable of acting on [it]." *Id.* at 2131-32 (citation omitted).

As explained below, *Jarkesy*'s synthesis of the public-rights exception makes clear that it applies with full force here, and the Court need not determine whether the claims are legal or equitable under *Jarkesy*'s two-prong text. But under application of that test, the Court should hold that the claims are equitable.

　　　　　a.     *The claims fall under the public-rights exception.*

As the Supreme Court has explained, where a matter involves public rights, Congress may "properly assign[] a matter to adjudication in a non-Article III tribunal," without implicating the Seventh Amendment. *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 345 (2018) (citation omitted); *see also Jarkesy*, 144 S. Ct. at 2137. "The crucial question" in

examining the public-rights exception is whether Congress "has created a seemingly private right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution." *Granfinanciera*, 492 U.S. at 54 (cleaned up). As *Jarkesy* explained, two overarching types of claims fall within the public-rights exception: (1) matters that "historically could have been determined exclusively by [the executive and legislative] branches" such as immigration, foreign commerce, relations with Indian tribes, and matters involving public benefits, *id.* at 2132-33 (citation omitted; alteration in original); and (2) claims that were "unknown to common law," *id*. at 2137 (citing *Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 461 (1977)). The claims here satisfy both categories.

　　**The claims involve public benefits**. As the Court reaffirmed in *Jarkesy*, adjudications involving "the granting of public benefits such as payments to veterans . . . pensions . . . and patent rights," fall under the public-rights exception. *See Jarkesy*, 144 S. Ct. at 2133. HUD's Section 537 claims plainly arise from a program that provides public benefits—namely, multifamily FHA-insured mortgages that ensure affordable housing for the public. Thus, HUD's claims fall under the public-rights exception.

　　The fact that HUD's claims concern the adjudication of claims related to public benefits is dispositive of both the Article III and Seventh Amendment claims. *See id.* at 2132 (explaining that in "matters [that] historically could have been determined exclusively by [the executive and legislative] branches . . . . no involvement by an Article III court in the initial adjudication is necessary" (second alteration in original; citation omitted)). But the Court could also hold that HUD's claims fall within the public-rights exception because they are unknown to common law.

　　**The claims are unknown to common law.** In *Atlas Roofing*, the Court held that a civil-penalty action brought under the Occupational Safety and Health Act ("OSH Act") fell within the

public-rights exception because by enacting the OSH Act, Congress sought to create a regulatory regime that was "self-consciously novel" in "both concept and execution" as opposed to merely "adjudicating claims that traced their ancestry to the common law." *Jarkesy*, 144 S. Ct. at 2137 (summarizing *Atlas Roofing*, 430 U.S.).

Section 537 is similarly self-consciously novel in both concept and execution. Section 537 was enacted as a part of the monumental regulatory regime established under the National Housing Act, with the overarching mandate to create, funds, and regulate affordable housing. Under Section 537, HUD enforces compliance with the requirements for FHA-insured mortgages. These mortgages on multifamily housing projects often provide more favorable terms than comparable private loans to "encourage investments in higher-risk properties in underserved areas," and in doing so "help sustain profitability of various multifamily projects." Getter at 10, *supra* at p.4.

Importantly, underlying these benefits is the assumption that HUD can resort to administrative enforcement when its business partners break their promises because that is the exclusive method that Congress created for HUD to use in response to a regulatory violation. HUD's other enforcement tools, such as suspension and debarment, limited denial of participation, program exclusion, or the False Claims Act do not provide a meaningful remedy in all cases because they provide different penalties (debarment, suspension, treble damages) for different conduct (*e.g.*, criminal convictions, failure to pay debts, submission of false claims). And those tools often require a greater investment of money, time, or both.

Without the ability to seek administrative penalties, HUD's programs would need to function differently than Congress intended. For example, without recourse to administrative penalty actions, HUD's programs might have to become more risk averse as to the borrowers insured or more aggressive as to day-to-day supervision of its partners because of the dearth of

meaningful post-violation remedies. *See HUD Reform: Hearing before the Subcomm. on Hous. & Cmty. Dev. of the H. Comm. on Banking, Fin. & Urb. Affs.*, 101st Cong. at 1-2, 107, 261 (1989) (explaining that pre-Section 537, the principal remedies of debarment or declaring the mortgage in default would result in HUD foreclosing on the property at a loss, paying an insurance claim to the lender, and eventual "reduction in services to tenants"). In short, Section 537 was enacted in response to a unique challenge that arose when the Government sought to regulate the conduct of its business partners while minimizing the damage to the tenants (i.e. the ultimate beneficiaries of the affordable housing programs). In this way, the regulatory regime here resembles the regulatory regime created by the OSH Act in *Atlas Roofing*, in which Congress "intended the agency to 'develop[ ] innovative methods, techniques, and approaches for dealing with occupational safety and health problems.'" *Jarkesy*, 144 S. Ct. at 2137 (citation omitted).

Against this backdrop, it becomes clear that HUD's Section 537 claims involve a "public right" as they are "integrally related to particular Federal Government action." *See Stern v. Marshall,* 564 U.S. 462, 490-91 (2011). Simply put, by creating the regulatory regime under the National Housing Act and its subparts, such as Section 537, Congress created a "new cause of action, and remedies therefor, unknown to the common law." *See Jarkesy*, 144 S. Ct. at 2137 (citation omitted).

By contrast, the cause of action in *Jarkesy* never depended on an administrative-enforcement procedure. For decades, the Supreme Court emphasized, the SEC could bring civil money penalty actions *only* in an Article III court. *Id.* at 2126. Even after a 2010 statute gave the SEC the option to do so administratively, it retained the ability to go to federal court as well, *id.*, suggesting that the administrative forum was not a fundamental part of the statutory scheme. As the Court explained, "[t]he novel claims in *Atlas Roofing* had never been brought in an Article III

court," while "Congress had authorized the SEC to bring [securities fraud] actions in Article III courts and still authorizes the SEC to do so today." *Id.* at 2139. Here, as in *Atlas Roofing*, HUD's civil money penalty actions have always been committed exclusively to administrative tribunals.

Moreover, the nature of the relationship between HUD and Plaintiffs provides a critical distinction from *Jarkesy*. In *Jarkesy*, the SEC exercised its power "to regulate transactions between private individuals interacting in a pre-existing market." *Id.* at 2136. Not so here. HUD does not act as a regulator of private market participants; instead, the Government created the market. Plaintiffs are willing participants in a consensual, mutually beneficial Government program. And HUD is also the injured party, acting in its own name to redress its own injury and enforce its own statutes and regulations. The injury, the cause of action, and the remedy are all integrally related to a specific, self-consciously novel Government housing assistance program. Whereas in *Jarkesy*, the SEC sought penalties against the respondents for defrauding investors, not the SEC, HUD acts here to enforce its own rights as a mortgage insurer and provider of public benefits. At bottom, HUD's claims vindicate HUD's rights, which are a product of the affordable housing regulatory scheme established by the National Housing Act.

In short, in enacting the National Housing Act and its building blocks, including Section 537, Congress did not seek "to enable the Federal Government to bring or adjudicate claims that traced their ancestry to the common law." *Id.* at 2137. Rather, it sought to create a "self-consciously novel" regulatory regime for federally supported affordable housing, *id.*, and properly assigned the adjudication of claims arising out of this regulatory regime to HUD. The Court should hold that HUD's claims fall under the public-rights exception, and are therefore properly before OHA.

        b.       *Under* Jarkesy*, the Seventh Amendment does not apply where, as here, the suit is equitable.*

Even were the Court to conclude that HUD's claims do not fall under the public-rights exception, it should nevertheless hold that they are not subject to trial by a jury because they are equitable under *Jarkesy*'s two prongs, which evaluate: (1) "the remedy" and (2) "the cause of action." *Id.* at 2129. Because some actions can "sound in both law and equity," the remedy factor is "'more important.'" *Id.* (quoting *Tull v. United States*, 481 U.S. 412, 421 (1987)).[10]

      1.   The remedies provided by Section 537 are equitable.

In *Jarkesy*, the Court explained that "monetary relief can be legal or equitable," and "[w]hat determines whether a monetary remedy is legal is if it is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" 144 S. Ct. at 2129 (quoting *Tull*, 481 U.S. at 422). The Court then examined the relief provisions of the Securities Exchange Act (SEA) and the Investment Advisers Act (IAA) and concluded that the civil penalties were legal in nature as they were tied to the "need to punish the defendant rather than to restore the victim." 144 S. Ct. at 2129. Plaintiffs argue that the civil penalties at issue here are like those at issue in *Jarkesy*, and therefore "legal" in nature. Plaintiffs' argument misses the mark.

In reaching its conclusion in *Jarkesy*, the Court observed that several of the factors that determined the civil penalty under the statutory provisions concern "culpability, deterrence, and recidivism." *Id.* Moreover, as the Court emphasized, both the SEA and the IAA "establish three 'tiers' of civil penalties," which condition the civil penalty "on the culpability of the defendant and the need for deterrence, not the size of the harm that must be remedied." *Id.* at 2129-30. The Court

---

[10] Plaintiffs erroneously rely on *Jarkesy* to assert their Article III claim. But *Jarkesy* was solely a Seventh Amendment case. *See* 144 S. Ct. at 2139–40 (Gorsuch, J., concurring) ("The Court decides a single issue: Whether the Securities and Exchange Commission's use of inhouse hearings to seek civil penalties violates the Seventh Amendment right to a jury trial."). Thus, *Jarkesy* lends no support to Plaintiffs' Article III claim. But in any event, as explained above, under the public-rights exception, Congress properly assigned HUD's claims to administrative adjudication without usurping Article III powers. *See supra* I.B(ii)(a).

noted, "the SEC is not obligated to return any money to victims." *Id.* At bottom, the Court concluded, the provisions are "designed to punish and deter, not to compensate." *Id.* As such, the Court ruled that the remedies were legal and implicated the Seventh Amendment. *Id.*

By contrast, the factors for determining the civil penalty under Section 537 do not focus solely on punishment and deterrence. *See* 12 U.S.C. § 1735f-15(d)(3) (statutory factors); 24 C.F.R. § 30.80 (corresponding regulatory factors). Section 537 considers factors such as the violator's "ability to pay the penalty" "injury to the public," "injury to the tenants," and "injury to the lot owners." *see* 24 C.F.R. § 30.80(c), (d), & (j), which indicate that the purpose of the civil penalty under Section 537 is broader than those in *Jarkesy*. *Cf. Jarkesy*, 144 S. Ct. at 2130 ("Each tier conditions the available penalty on the culpability of the defendant and the need for deterrence."). Indeed, here, "a single violation that causes serious injury to the public or the tenants," can be grounds for assessing a civil penalty, 24 C.F.R. § 30.45(e), whereas in *Jarkesy*, "showing that a victim suffered harm [was] not even required to advance a defendant from one tier to the next." 144 S. Ct. at 2130.

In sum, contrary to Plaintiffs' argument, the civil penalties at issue here are distinguishable from the "legal" remedies in *Jarkesy*.

> 2. Causes of action under Section 573 are not found in common law.

The second prong of *Jarkesy* also illustrates that HUD's claims are equitable because they "are [not] analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century." *Granfinanciera*, 492 U.S. at 42.

This prong examines the "relationship between the causes of action in this case and common law." *Jarkesy*, 144 S. Ct. at 2130. In doing so, the Court must "compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of

law and equity." *Tull*, 481 U.S. at 417–18. There is simply no 18th Century common law analogue to HUD's claims against Plaintiffs under Section 537. At bottom, HUD's claims arise out of unique statutory causes of actions enacted by Congress to supervise the conduct of Government's business partners in the Government-created area of affordable housing. Needless to say, this regulatory scheme—let alone claims arising out of it—did not exist in the 18th Century.

Plaintiffs, in an attempt to satisfy prong two, argue that HUD's claims are nothing more than run-of-the-mill breach of contract claims. Plaintiffs' analogy is misguided. HUD's claims principally arise out statutory and regulatory prohibitions on unauthorized use of funds. *See* 12 U.S.C. § 1735f-15(c)(1)(B)(ii); 24 C.F.R. § 30.45(c). The mere fact that these requirements also appear in Plaintiffs' Regulatory Agreements does not convert HUD's statutory and regulatory claims into contract claims.[11]

Plaintiffs' other attempts at analogizing HUD's claims to other broad categories of claims such as fraud, trespass, and action in debt also fail. At bottom, HUD's claims do not carry "old soil" from any such common-law claims. *Jarkesy*, 144 S. Ct. at 2130 (citation omitted); *cf. id.* (explaining that in enacting the SEA and the IAA, Congress "incorporated prohibitions from common law fraud," and its "decision to draw upon common law fraud created an enduring link between federal securities fraud and its common law ancestor") (citation omitted)). In enacting Section 537, Congress did not borrow from any common law form of fraud, trespass, and action in debt that targeted "the same basic conduct," *id.*—because none did. Rather, Congress created a

---

[11] While HUD's administrative complaints mention that Plaintiffs' violations of the statutory and regulatory prohibition against the unauthorized distribution of funds *also* violate particular provisions of the Regulatory Agreements, Plaintiffs' liability for civil money penalties hinges on the statutory and regulatory violations as outlined in 12 U.S.C. § 1735f-15(c)(1)(B)(ii) and 24 C.F.R. § 30.45(c).

new regulatory scheme for affordable housing, which gave rise to new rights, causes of actions, and remedies that were "unknown to the common law." *Id.* at 2137 (citation omitted).

## II. PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE HARM.

Even if the Court reaches the issue of irreparable harm, it should deny the injunction because Plaintiffs fail to establish the type of imminent, irreparable harm needed to justify a preliminary injunction. "[E]ven the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'" *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).

As an initial matter, Plaintiffs' own delay in filing for injunctive relief weighs against finding irreparable harm. *See Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013) (finding district court did not err in considering delay as a factor weighing against injunction). Plaintiffs waited until November 27, 2024, to file their motion for a preliminary injunction—nearly seventh months after the ALJ consolidated all the administrative complaints, and five months after the Supreme Court's decision in *Jarkesy*. Such "an unreasonable delay in filing for injunctive relief . . . weigh[s] against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013).

Moreover, Plaintiffs fail to identify any irreparable harm. Plaintiffs' entire irreparable-harm argument assumes success on the merits. *See* Pls. Br. 15-16. As explained above, however, Plaintiffs are unlikely to prevail on the merits, and thus, even on their own theory, they fail to even suggest any irreparable harm.

But even if the Court disagrees with the Government on the merits, it should nevertheless conclude that Plaintiffs fail to identify any irreparable harm. Not every constitutional claim

presents an irreparable harm. *See Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 753 (10th Cir. 2024). Plaintiffs, relying on *Axon*, 598 U.S. 175, argue that the ongoing OHA proceedings constitute a "here and now" injury. Pls. Br. 16. This Court should follow the Tenth Circuit's recent, persuasive decision in *Leachco*, and reject this overly expansive reading of *Axon*. *Leachco* held that "Supreme Court precedent supports a narrow application of *Axon*'s 'here-and-now injury' language."103 F.4th at 759. *Axon* concerned whether the district court had jurisdiction; it was not about what a plaintiff must show to obtain relief. *Id.* Furthermore, *Axon*'s "here and now injury" language came from *Seila Law*'s discussion of standing, which similarly did not address entitlement to relief. *Id.* (citing *Seila Law, LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 212 (2020)). Thus, *Axon* does not support a finding of irreparable harm here.

Plaintiffs have failed to provide any caselaw for the proposition that the ongoing administrative proceeding constitute irreparable harm—nor could they. Any harm to Plaintiffs as a result of the proceedings before OHA is reparable. Even if Plaintiffs receive a favorable ruling from any court *after* an adverse administrative ruling, that court could vacate OHA's grant of any legal remedies. As such, any alleged denial of a trial before a jury or adjudication in an Article III court could be readily remedied in due course. Notably, Plaintiffs do not—and, in fact, cannot—rely on litigation expenses they will incur during the course of this judicial proceeding or the administrative proceeding as irreparable harm. *See Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.").

Because Plaintiffs have failed to show irreparable harm, the Court should deny their request for a preliminary injunction on that ground alone. *See D.T.*, 942 F.3d at 326–27.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF.

Although the balance of the equities and the public interest typically are considered as separate factors, "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these combined factors strongly counsel against an injunction. The provisions at issue here entrust HUD to ensure the proper use of FHA-insured mortgages. *See* 12 U.S.C. § 1735f-15(c)(1)(B)(ii); 24 C.F.R. § 30.45(c). In doing so, not only do they protect government funds, but they further advance the overarching and compelling Government interest in providing "a decent home and a suitable living environment for every American family." 12 U.S.C. § 1701t.

Through the current administrative proceeding, HUD is carrying out its duties under Section 537 to protect government funds and promote affordable housing. If the Government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). This is particularly true here, where the proceedings at issue are part of a longstanding structure in effect in agencies throughout the federal government. *See Miranda v. Garland*, 34 F.4th 338, 366 (4th Cir. 2022) (vacating injunction that would cause a "sea change" in federal immigration hearings). Moreover, halting the administrative proceedings during the pendency of the present action would raise the likelihood that, in the interim, "records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused." *Loc. Lodge No. 1424 v. NLRB*, 362 U.S. 411, 419 (1960) (citation omitted). On the other side of the balance, Plaintiffs have failed to identify any irreparable harm warranting an injunction. As such, the balance of the equities and public interest weigh against granting Plaintiffs' motion.

## CONCLUSION

For the reasons explained above, the Court should deny Plaintiffs' motion.


Dated: January 8, 2025                    Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          Principal Deputy Assistant Attorney General

                                          CHRISTOPHER R. HALL
                                          Assistant Branch Director

                                          */s/ Pardis Gheibi*
                                          PARDIS GHEIBI (D.C. Bar No. 90004767)
                                          Trial Attorney; U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street, N.W.
                                          Washington, D.C. 20005
                                          Tel.: (202) 305-3246
                                          Email: pardis.gheibi@usdoj.gov
                                          *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2025, I electronically filed this document with the
Court by using the CM/ECF system, and that this document was distributed via the Court's
CM/ECF system.


*/s/ Pardis Gheibi*