# EXHIBIT A

Do not photocopy – print from original artwork. Do not photocopy – print from original artwork.



*N D T*

HUD LASERFICHE BARCODE SEPERATOR SHEET

# NEW Document Type

**IREMS ID:** __800016409_____

# Regulatory Agreement

After recording return to:
U.S. Dept of Housing and Urban Development
Cleveland Field Office
US Bank Centre on Playhouse Square
1350 Euclid Avenue, Suite 500
Cleveland, Ohio  44115-1815
Attn:  Raymond Keyser, Esq.

This Document Prepared by:
Christine Waldmann Carmody, Esq.
Pepper Hamilton LLP
600 Fourteenth Street, N.W.
Washington, D.C.  20005

**Regulatory Agreement**
**for**
**Multifamily Housing Projects**

by and between

Cherry Estates Limited Partnership,
an Ohio limited partnership

and

the Secretary of Housing and Urban Development

# Regulatory Agreement for Multifamily Housing Projects

U.S. Department of Housing and Urban Development
Office of Housing
Federal Housing Commissioner

## Under Sections 207, 220, 221 (d)(4), 231 and 232, Except Nonprofits

| Project Number | Mortgagee |
| --- | --- |
| 042-11163 | FOREST CITY CAPITAL CORPORATION |

| Amount of Mortgage Note | Date |
| --- | --- |
| $1,205,400.00 | July 14, 2011 |

| Mortgage Recorded   State: OH | County: Portage | Date | Originally endorsed for insurance under Section |
| --- | --- | --- | --- |
| Book | Page | July 14, 2011 | 207 pursuant to Section 223(f) |

This Agreement entered into this 14th day of July, 2011, between Cherry Estates Limited Partnership, an Ohio limited partnership, whose address is 8111 Rockside Rd., Suite 200, Cleveland, Ohio 44125, its successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned Secretary of Housing and Urban Development and his successors (hereinafter referred to as Secretary).

In consideration of the endorsement for insurance by the Secretary of the above described note or in consideration of the consent of the Secretary to the transfer of the mortgaged property or the sale and conveyance of the mortgaged property by the Secretary, and in order to comply with the requirements of the National Housing Act, as amended, and the Regulations adopted by the Secretary pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and during such further period of time as the Secretary shall be the owner, holder or reinsurer of the mortgage, or during any time the Secretary is obligated to insure a mortgage on the mortgaged property:

1.  Owners, except as limited by paragraph 17 hereof, assume and agree to make promptly all payments due under the note and mortgage.

2.  (a)  Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage insured or held by the Secretary of an amount equal to $1,860.00 per month* unless a different date or amount is approved in writing by the Secretary.

    Such fund, whether in the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States of America shall at all times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for any other purpose, may be made only after receiving the consent in writing of the Secretary.  In the event that the owner is unable to make a mortgage note payment on the due date and that payment cannot be made prior to the due day of the next such installment or when the mortgagee has agreed to forgo making an election to assign the mortgage to the Secretary based on a monetary default, or to withdraw an election already made, the Secretary is authorized to instruct the mortgagee to withdraw funds from the reserve fund for replacements to be applied to the mortgage payment in order to prevent or cure the default.  In addition, in the event of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Secretary may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

    (b)  Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replacements to be established will be equal to the amount due to be in such fund under existing agreements or charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund is approved in writing by the Secretary.

3.  Real property covered by the mortgage and this agreement is described in Exhibit A attached hereto.

    (This paragraph 4 is not applicable to cases insured under Section 232.)

4.  (a)  Owners shall make dwelling accommodation and services of the project available to occupants at charges not exceeding those established in accordance with a rental schedule approved in writing by the Secretary, for any project subject to regulation of rent by the Secretary. Accommodations shall not be rented for a period of less than thirty (30) days, or, unless the mortgage is insured under Section 231, for more than three years. Commercial facilities shall be rented for such use and upon such terms as approved by the Secretary. Subleasing of dwelling accommodations, except for subleases of single dwelling accommodations by the tenant thereof, shall be prohibited without prior written approval of Owners and the Secretary and any lease shall so provide. Upon discovery of any unapproved sublease, Owners shall immediately demand cancellation and notify the Secretary thereof.

    (b)  Upon prior written approval by the Secretary, Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owners or others to such tenant upon his request, in addition to the facilities and services included in the approved rental schedule. Approval of charges for facilities and services is not required for any project not subject to regulation of rent by the Secretary.

    (c)  For any project subject to regulation of rent by the Secretary, the Secretary will at any time entertain a written request for a rent increase properly supported by substantiating evidence and within a reasonable time shall:

*plus an initial deposit in the amount of $300,000.00

---

(i) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which Owners have no effective control or;

(ii) Deny the increase stating the reasons therefor.

5. (a) If the mortgage is originally a Secretary-held purchase money mortgage, or is originally endorsed for insurance under any Section other than Sections 231 or 232 and is not designed primarily for occupancy by elderly persons, Owners shall not in selecting tenants discriminate against any person or persons by reason of the fact that there are children in the family.

(b) If the mortgage is originally endorsed for insurance under Section 221, Owners shall in selecting tenants give to displaced persons or families an absolute preference or priority of occupancy which shall be accomplished as follows:

(1) For a period of sixty (60) days from the date of original offering, unless a shorter period of time is approved in writing by the Secretary, all units shall be held for such preferred applicants, after which time any remaining unrented units may be rented to non-preferred applicants;

(2) Thereafter, and on a continuing basis, such preferred applicants shall be given preference over non-preferred applicants in their placement on a waiting list to be maintained by the Owners; and

(3) Through such further provisions agreed to in writing by the parties.

(c) Without the prior written approval of the Secretary not more than 25% of the number of units in a project insured under Section 231 shall be occupied by persons other than elderly persons.

(d) All advertising or efforts to rent a project insured under Section 231 shall reflect a bona fide effort of the Owners to obtain occupancy by elderly persons.

6. Owners shall not without the prior written approval of the Secretary:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property.

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds except from surplus cash, except for reasonable operating expenses and necessary repairs.

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the property, or the interest of any general partner in a partnership owning the property, or any right to manage or receive the rents and profits from the mortgaged property.

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project.

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except surplus cash and except on the following conditions:

(1) All distributions shall be made only as of and after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction;

(2) No distribution shall be made from borrowed funds, prior to the completion of the project or when there is any default under this Agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds; and

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project.

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any funds collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account.

(h) Permit the use of the dwelling accommodations or nursing facilities of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Secretary.

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

8. Owners shall not file any petition in bankruptcy or for a receiver or in insolvency or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors, or permit an adjudication in bankruptcy or the taking possession of the mortgaged property or any part thereof by a receiver or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale, and fail to have such adverse actions set aside within forty-five (45) days.

9. (a) Any management contract entered into by Owners or any of them involving the project shall contain a provision that, in the event of default hereunder, it shall be subject to termination without penalty upon written request by the Secretary. Upon such request Owners shall immediately arrange to terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Secretary for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by the Secretary or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Secretary or his duly authorized agents.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Secretary.

(e) Within sixty (60) days following the end of each fiscal year the Secretary shall be furnished with a complete annual financial report based upon an examination of the books and records of mortgagor prepared in accordance with the requirements of the Secretary, prepared and certified to by an officer or responsible Owner and, when required by the Secretary, prepared and certified by a Certified Public Accountant, or other person acceptable to the Secretary.

(f) At request of the Secretary, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to income, assets, liabilities, contracts, operation, and condition of the property ad the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a financial institution, whose deposits are insured by an agency of the Federal Government. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as permitted by paragraph 6(e) above. Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any Owner receiving property of the project in violation of this Agreement shall hold such funds in trust. At such time as the Owners shall have lost control and/or possession of the project, all funds held in trust shall be delivered to the mortgagee to the extent that the mortgage indebtedness has not been satisfied.

(h) If the mortgage is insured under Section 232:

(1) The Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as a nursing home and shall not lease all or part of the project except on terms approved by the Secretary.

(2) The Owners shall suitably equip the project for nursing home operations.

(3) The Owners shall execute a Security Agreement and Financing Statement (or other form of chattel lien) upon all items of equipment, except as the Secretary may exempt, which are not incorporated as security for the insured mortgage. The Security Agreement and Financing Statement shall constitute a first lien upon such equipment and shall run in favor of the mortgagee as additional security for the insured mortgage.

(i) If the mortgage is insured under Section 231, Owners or lessees shall at all times maintain in full force and effect from the state or other licensing authority such license as may be required to operate the project as housing for the elderly.

10. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, religion or creed, sex, or national origin, including Title VIII of the Civil Rights Act of 1968 (Public Law 90-284; 82 Stat. 73), as amended, Executive Order 11063, and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities (including 24 CFR Parts 100, 107 and 110, and Subparts I and M of Part 200).

11. Upon a violation of any of the above provisions of this Agreement by Owners, the Secretary may give written notice thereof, to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Secretary, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Secretary within thirty (30) days after the date such notice is mailed or within such further time as the Secretary determines is necessary to correct the violation, without further notice the Secretary may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Secretary may:

(a) (i) If the Secretary holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(ii) If said note is not held by the Secretary - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Secretary as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the Owners' obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project.

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Secretary in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of the note and mortgage.

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Secretary arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

12. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Secretary because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Secretary their rights to the rents, profits, income and charges of whatsoever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", "Security Instrument", and any other security for the note identified herein, and endorsed for insurance or held by the Secretary;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors, heirs and assigns;

(d) "Mortgaged Property" includes all property, real, personal or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Secretary;

(e) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other activities as are incidental thereto;

(f) "Surplus Cash" means any cash remaining after:

   (1) the payment of:

      (i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Secretary;

      (ii) All amounts required to be deposited in the reserve fund for replacements;

      (iii) All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Secretary; and

   (2) the segregation of:

      (i) An amount equal to the aggregate of all special funds required to be maintained by the project; and

      (ii) All tenant security deposits held.

(g) "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project.

(h) "Default" means a default declared by the Secretary when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Secretary after written notice;

(i) "Section" refers to a Section of the National Housing Act, as amended.

(j) "Displaced persons or families" shall mean a family or families, or a person, displaced from an urban renewal area, or as the result of government action, or as a result of a major disaster as determined by the President pursuant to the Disaster Relief Act of 1970.

(k) "Elderly person" means any person, married or single, who is sixty-two years of age or over.

14. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Secretary and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Secretary shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16. The invalidity of any clause, part or provisions of this Agreement shall not affect the validity or the remaining portions thereof.

17. The following Owners: Cherry Estates Limited Partnership and all existing and future partners

Do not assume personal liability for payments due under the note and mortgage, or for the payments to the reserve for replacements, or for matters not under their control, provided that said Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

**(To be executed with formalities for recording a deed to real estate.)**

See attached Rider and Signature Riders. This instrument may be executed in multiple counterparts which, when fully assembled, shall constitute one and the same instrument.

Rider
to Regulatory Agreement for
Multifamily Housing Projects

This Rider is attached to and made a part of that certain Regulatory Agreement for Multifamily Housing Projects dated July ⎵14⎵, 2011 (the "Agreement") by and between CHERRY ESTATES LIMITED PARTNERSHIP, an Ohio limited partnership ("Owners") and the Secretary of Housing and Urban Development (the "Secretary") with respect to Cherry Estates Apartments, located in Kent, Portage County, Ohio FHA Project No. 042-11163. In the event of any conflict between any provision of this Rider and any other provision of the Agreement, the provision of this Rider shall be controlling. The Agreement is hereby amended and supplemented as follows:

      A.    Reserve Fund for Replacements. The following is hereby added to the end of the first subparagraph of paragraph 2(a) of the Agreement:

      The amount of the monthly deposits to the reserve fund for replacements shall be subject to change in accordance with the requirements of the Secretary, but such change can be accomplished by a letter from HUD to the Owner and will not necessitate an amendment to the Agreement. In connection therewith, every ten (10) years, the mortgagee shall obtain a physical and capital needs assessment report for the Secretary to evaluate. The cost of such report may be paid from the reserve fund for replacements.

      B.    LIHPRHA Use Agreement. The following is hereby added as paragraph 18 of the Agreement:

      Owners shall comply with the terms of that certain "Use Agreement and Amendment of Existing Regulatory Agreement For Multifamily Projects Insured or Assisted Under Section 221(d)(3) of the National Housing Act and Subject to the Low-Income Housing Preservation and Resident Home Ownership Act of 1990 with a Capital Grant and Sale of Property" (the "Use Agreement") as recorded July 19, 1996 in Volume 126, Page 291 of the Portage County, Ohio. Such compliance shall include, without limitation, residual receipts requirements as set forth in Paragraphs 2(c) and 14(g) of that certain "Regulatory Agreement for Non-Profit and Public Mortgagors Under Section 221(d)(3) of the National Housing Act, As Amended," FHA Form No. 1733, recorded contemporaneously with, and incorporated by Section 15 of, said Use Agreement.

Cherry Estates Apartments
Kent, Portage County, Ohio
FHA No. 042-11163

## SIGNATURE RIDER
## TO
## REGULATORY AGREEMENT FOR MULTIFAMILY HOUSING PROJECTS

**OWNER**:

**CHERRY ESTATES LIMITED PARTNERSHIP,**
an Ohio limited partnership

By:    Cherry Estates Investment, LLC,
an Ohio limited liability company
its general partner

        By:    _____
                Frank T. Sinito
                Managing Member

STATE OF OHIO              )
                          ) ss
COUNTY OF _Cuyahoga_    )

    I, a Notary Public of the County and State aforesaid, certify that Frank T. Sinito personally came before me this _11_ day of July, 2011, and acknowledged that he is the Managing Member of Cherry Estates Investment, LLC, an Ohio limited liability company, the general partner of Cherry Estates Limited Partnership, an Ohio limited partnership, and on behalf of said limited partnership did acknowledge the foregoing instrument to be the act and deed of said Cherry Estates Limited Partnership. Witness my hand and notarial seal the day and year first above written.

[SEAL]

                                    Notary Public

My commission expires: LAWRENCE H. LUNDBERG, Attorney at Law
                Notary Public – State of Ohio
                My Commission Has No Expiration Date,
                Section 147.03 O.R.C.

### [SIGNATURES CONTINUED ON NEXT PAGE]

**SECRETARY:**

Secretary of Housing and Urban Development
Acting By and Through the
Federal Housing Commissioner

By: _____

Print Name:
Authorized Agent

STATE OF OHIO           )
                              ) ss
COUNTY OF  FRANKLIN    )

      The foregoing instrument was acknowledged before me this *13th* day of July, 2011 by WILLIAM INVING, Authorized Agent of the Secretary of Housing and Urban Development, acting by and through the Federal Housing Commissioner.  Witness my hand and notarial seal the day and year first above written.

[SEAL]

_____
Notary Public

My commission expires: _____

WILLIAM W. CUSACK
Attorney at Law
Notary Public, State of Ohio
My Commission Has No Expiration
Section 147.03 R.C.

## EXHIBIT A
### Legal Description

The land referred to in this Commitment is described as follows:

Situated in the City of Kent, County of Portage and State of Ohio:

And known and described as Lot No. One Hundred Seventy (170) in Henry Ainsworth Addition to the Village of Kent as the same is platted and recorded in Deed, Volume 88, Page 43 of the public records of said Portage County

Situated in the City of Kent, County of Portage and State of Ohio, and known and described as Lot No. One Hundred Seventy-One (171) in Henry Ainsworth Addition to the Village of Kent as the same is platted and recorded in Deed, Volume 88, Page 43 of the public records of said Portage County

AND FURTHER DESCRIBED AS, Situated in the City of Kent, County of Portage and State of Ohio, and known as being part of Franklin Township Lot 7, being known as Lots 170 and 171 of the Henry Ainsworth Addition, as recorded in Deed Volume 88, Page 43, Portage County Records, and further described as follows:

Beginning at an iron pin in the South right of way of Cherry Street, at the Northeast corner of Lot 170 of above mentioned allotment;

Thence S. 0° 43' W., along the East line of Lot 170, 390 feet to an iron pin in the South line of the allotment;

Thence N. 89° 35' W., along the South line of the allotment, 240 feet to an iron pin at the Southwest corner of Lot 171;

Thence N. 0° 43' E., along the West line of Lot 171, 390 feet to an iron pin in the South right of way of Cherry Street;

Thence S. 89° 35' E., along the South right of way of Cherry Street, 240 feet to the beginning and containing 2.1487 acres as surveyed by Raymond L. Dray, Professional Surveyor 5476, March 15, 1973, be the same more or less.

FHA Form No. 1729
Rev. Nov. 1, 1967
* (Prior Revisions Obsolete)

U. S DEPARTMENT OF HOUSING AND URBAN DEVELOP-MENT
FEDERAL HOUSING ADMINISTRATION

## REGULATORY AGREEMENT FOR LIMITED DISTRIBUTION MORTGAGOR PROJECTS
## UNDER SECTION 221(d)(3) OF THE NATIONAL HOUSING ACT, AS AMENDED

Project No.    042-35109-LDP

Mortgagee    Metropolitan Mortgage Corporation of Ohio

Amount of Mortgage Note    $661,100.00                     Date May 29 , 197

Mortgage: Recorded:             State  Ohio        County  Portage     DateMay 29 , 1973

~~File No. 198311 ~~ ~~Book~~                     ~~Page~~

This Agreement entered into this          29TH          day of    May          , 19 73 ,

between  Cherry Estates, an Ohio Limited Partnership, by Sam Riemer, its
General Partner for and on behalf of said limited partnership
whose address is   18330 Lomond Blvd., Shaker Heights, Ohio 44122

their successors, heirs, and assigns (jointly and severally, hereinafter referred to as Owners) and the undersigned
Secretary of Housing and Urban Development and his successors, acting by and through the Federal Housing Commission-
er (hereinafter called Commissioner).

In consideration of the endorsement for insurance by the Commissioner of the above described note or in considera-
tion of the consent of the Commissioner to the transfer of the mortgaged property, and in order to comply with the
requirements of Section 221(d)(3) of the National Housing Act, as amended, and the Regulations adopted by the Commis-
sioner pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the
mortgaged property and the project operated thereon and so long as the contract of mortgage insurance continues in ef-
fect, and during such further period of time as the Commissioner shall be the owner, holder or reinsurer of the mortgage,
or during any time the Commissioner is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 17 hereof, shall promptly make all payments due under the note and
   mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such
   reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by
   the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mortgage
   insured or held by the Commissioner of an amount  equal to $    236.84        per month unless a different
   date or amount is approved in writing by the Commissioner. Such fund, whether in the form of a cash deposit
   or invested in obligations of, or fully guaranteed as to principal by, the United States of America, shall at all
   times be under the control of the mortgagee. Disbursements from such fund, whether for the purpose of effec-
   ting replacement of structural elements and mechanical equipment of the project or for any other purpose,
   may be made only after receiving the consent in writing of the Commissioner. In the event of a default in the
   terms of the mortgage, pursuant to which the loan has been accelerated, the Commissioner may apply or
   authorize the application of the balance in such fund to the amount due on the mortgage debt as accelerated.

   (b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for
   replacements to be established will be equal to the amount due to be in such fund under existing agreements or
   charter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first
   payment due on the mortgage after acquisition, unless some other method of establishing and maintaining the
   fund is approved or required in writing by the Commissioner.

   (c) Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts
   fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, within 60 days
   after the end of the semiannual or annual fiscal period within which such receipts are realized. Residual
   receipts shall be under the control of the Commissioner, and shall be disbursed only on the direction of the
   Commissioner, who shall have the power and authority to direct that the residual receipts, or any part
   thereof, be used for such purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4. The Owners covenant and agree that:

(a) Admission to the project shall be limited to families having a low or moderate income which does not exceed the limits established by the Commissioner and in effect at the time of admission;

(b) Preference or priority for admission to the project and for placement on the waiting list, which Owners shall maintain, shall be extended to those families of low or moderate incomes who have certificates of eligibility as displaced families;

(c) On forms approved by the Commissioner they will obtain from each prospective tenant a certification of income prior to admission to the project, and a recertification of income from each tenant at least every two years following the date of admission;

(d) If any recertification discloses that family income exceeds the limits established by the Commissioner and in effect at the time of recertification, they shall either terminate the lease, or require the tenant to pay an increased rental in an amount computed in accordance with the formula prescribed by the Commissioner;

(e) They shall require all tenants to execute a lease in the form prescribed by the Commissioner, and shall not rent any unit in the project for less than 30 days nor more than one year;

(f) The rent charged for each unit shall not exceed the upper limit of the range shown for such type of unit on the rental schedule approved in writing by the Commissioner, and shall include the reasonable use of all utilities shown on said schedule, but in no event shall the total gross monthly rents for all dwelling units exceed the gross monthly dwelling income for all units approved by the Commissioner on the rental schedule;

(g) No increase will be made in the amount of the gross monthly dwelling income for all units as shown on the rental schedule unless such increase is approved by the Commissioner, who will at any time entertain a written request for an increase properly supported by substantiating evidence and within a reasonable time shall:

(1) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance expenses over which Owners have no effective control, or

(2) Deny the increase stating the reasons therefor;

(h) If there are rent supplement units in the project, the determination as to the eligibility of tenants for admission to such units and the conditions of continued occupancy shall be in accordance with the Rent Supplement Contract executed by the Owners and the Commissioner which is incorporated in and made a part of this Agreement;

(i) They will rent commercial facilities, if any, at not less than the rental approved by the Commissioner;

(j) In selecting tenants they shall not discriminate against any person or persons by reason of the fact that there are children in the family.

5. Upon prior written approval of the Commissioner, the Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and Owners for any facilities and/or services which may be furnished by the Owner or others to such tenant upon his request, in addition to the facilities and services included in the approved Rental Schedule.

6. Owners shall not without the prior written approval of the Commissioner:

(a) Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property;

(b) Assign, transfer, dispose of, or encumber any personal property of the project, including rents, or pay out any funds, other than from surplus cash, except for reasonable operating expenses and necessary repairs;

(c) Convey, assign, or transfer any beneficial interest in any trust holding title to the mortgaged property, or the interest of any general partner in a partnership owning the mortgaged property, or any right to manage or receive the rents and profits from the mortgaged property;

(d) Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project;

(e) Make, or receive and retain, any distribution of assets or any income of any kind of the project except from surplus cash and except on the following conditions:

(1) All distributions shall be made only as of or after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one fiscal year shall be limited to six per centum on the initial equity investment, which shall be determined by the Commissioner; the right to such distribution shall be cumulative;

(2) No distribution shall be made from borrowed funds or prior to the completion of the project, or when there is any default under this agreement or under the note or mortgage;

(3) Any distribution of any funds of the project, which the party receiving such funds is not entitled to retain hereunder, shall be held in trust separate and apart from any other funds;

(4) There shall have been compliance with all outstanding notices of requirements for proper maintenance of the project.

(f) Engage, except for natural persons, in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project;

(g) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any fund collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account;

(h) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Commissioner;

(i) Incur any liability, direct or contingent, other than for current operating expenses, exclusive of the indebtedness secured by the mortgage and necessarily incident to the execution and delivery thereof;

(j) Pay any compensation, including wages or salaries, or incur any obligations, to themselves, or any officers, directors, stockholders, trustees, partners, beneficiaries under a trust, or to any of their nominees;

(k) Enter into any contract or contracts for supervisory or managerial services.

7. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

8. Owners shall not file any petition in bankruptcy, or for a receiver, or in insolvency, or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors or permit an adjudication in bankruptcy, the taking possession of the mortgaged property or any part thereof by a receiver, or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale and fail to have such adverse actions set aside within forty-five days.

9. (a) Owners shall provide for the management of the project in a manner satisfactory to the Commissioner. Any management contract entered into by Owners, or any of them, involving the project shall contain a provision that it shall be subject to termination, without penalty and with or without cause, upon written request by the Commissioner addressed to the Owners. Upon receipt of such request Owners shall immediately terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Commissioner for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and shall be subject to examination and inspection at any reasonable time by the Commissioner or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Commissioner or his duly authorized agents.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Commissioner.

(e) Within sixty days following the end of each fiscal year the Commissioner shall be furnished with a complete annual financial report based upon an examination of the books and records of the mortgagor prepared in accordance with the requirements of the Commissioner, certified to by an officer or responsible Owner and, when required by the Commissioner, prepared and certified by a Certified Public Accountant, or other person acceptable to the Commissioner.

(f)  At the request of the Commissioner, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g)  All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C.  Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project or for distributions of surplus cash as limited by paragraph 6 (e) above.  Any Owner receiving funds of the project other than by such distribution of surplus cash shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust.  Any Owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust.

10.  Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, creed, or national origin, including Title VI of the Civil Rights Act of 1964 (Public Law 88-352, 78 Stat. 241), all requirements imposed by or pursuant to the Regulations of the Department of Housing and Urban Development (24 CFR, Subtitle A, Part 1) issued pursuant to that title, and regulations issued pursuant to Executive Order 11063.

11.  Upon a violation of any of the above provisions of this Agreement by Owners, the Commissioner may give written notice thereof to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Commissioner, be designated by the Owners as their legal business address.  If such violation is not corrected to the satisfaction of the Commissioner within thirty days after the date such notice is mailed or within such further time as the Commissioner reasonably determines is necessary to correct the violation, without further notice the Commissioner may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Commissioner may:

(a) (1) If the Commissioner holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(2)  If said note is not held by the Commissioner - notify the holder of the note of such default and request holder to declare a default under the note and mortgage, and the holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Commissioner as provided in the Regulations;

(b)  Collect all rents and charges in connection with the operation of the project and use such collections to pay the mortgagor's obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c)  Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Commissioner in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d)  Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Commissioner arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

12.  As security for the payment due under this Agreement to the reserve fund for replacements, and to secure under the Commissioner because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Commissioner their rights t the rents, profits, income and charges of whatever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein.  Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

13.  As used in this Agreement the term:

(a)  "Mortgage" includes "Deed of Trust", "Chattel Mortgage", and any other security for the note identified herein, and endorsed for insurance or held by the Commissioner;

(b)  "Mortgagee" refers to the holder of the mortgage identifed herein, its successors and assigns;

(c)  "Mortgagor" means the original borrower under the mortgage and its successors and assigns;

(d)  "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors and assigns;

(e)  "Mortgaged Property" includes all property, real, personal, or mixed covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Commissioner;

(f)  "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other such activities as are incidental thereto;

(g)  "Surplus Cash" means any cash remaining after:

(1)  the payment of:

(i)  All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Federal Housing Commissioner;

(ii)  All amounts required to be deposited in the reserve fund for replacements;

(iii)  All obligations of the project other than the insured mortgage unless funds for payment are set aside or deferment of payment has been approved by the Commissioner; and

(2)  the segregation of:

(i)  An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii)  All tenant security deposits held;

(h)  "Residual Receipts" means any cash remaining at the end of a semiannual or annual fiscal period after deducting from surplus cash the amount of all distributions as that term is defined below and as limited by Paragraph 6(e) hereof;

(i)  "Family" means (1) two or more persons related by blood, marriage, or operation of law who occupy the same unit; (2) a handicapped person who has a physical impairment which is expected to be of long continued and indefinite duration, substantially impedes his ability to live independently, and is of such a nature that his ability could be improved by more suitable housing conditions; (3) a single person, 62 years of age or older; or (4) a single person less than 62 years of age provided that occupancy by such persons is limited to 10% of the dwelling units in the project, unless the occupants receive rent supplement benefits pursuant to a rent supplement contract in which instance the 10 percent limitation shall not be applicable;

(j)  "Distribution" means any withdrawal or taking of cash or any assets of the project, including the segregation of cash or assets for subsequent withdrawal within the limitations of Paragraph 6(e) hereof, and excluding payment for reasonable expenses incident to the operation and maintenance of the project;

(k)  "Income" means the gross annual income of the family from all sources before taxes and withholding, after giving effect to exclusions allowed by the Commissioner;

(l)  "Default" means a default declared by the Commissioner when a violation of this Agreement is not corrected to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Commissioner after written notice.

14.  This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Commissioner and his successors so long as the contract of mortgage insurance continues in effect; and during such further time as the Commissioner shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

15.  Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other requirements in conflict therewith.

16.  The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

17.  The following Owners:   Cherry Estates, an Ohio Limited Partnership and Sam Riemer and Rebecca Riemer
do not assume personal liability for payments due under the note and mortgage, to the reserve for replacements, or for matters not under their control, except:

- 6 -

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date first hereinabove written.

Seal

Cherry Estates, a Limited Partnership
*Owners*

WITNESS

By _Sam Riemer, General Partner_

SECRETARY OF HOUSING AND URBAN DEVELOPMENT
acting by and through the FEDERAL HOUSING
COMMISSIONER

By _Authorized Agent_

*(Add proper acknowledgements)*

STATE OF OHIO          )
                       ) SS.
COUNTY OF CUYAHOGA )

BEFORE ME, a Notary Public in and for said County and State, personally appeared the above-named Sam Riemer, as general partner of CHERRY ESTATES, an Ohio limited partnership, who acknowledged that he did sign the foregoing instrument as such General Partner and that the same is his free act and deed individually and as such General Partner.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Cleveland, Ohio, this 29 day of May, 1973.

Notary Public

LAWRENCE C. SHERMAN, Attorney At Law
Notary Public - State of Ohio
My commission has no expiration date.
Section 147.03 R.C.

252658-P Rev. 10/69
HUD-Wash., D. C.

STATE OF OHIO        )
                       ) SS.
COUNTY OF CUYAHOGA )

BEFORE ME, a Notary Public in and for said County and State, personally appeared _William K. Brown_, who, being duly sworn did say that he is the duly appointed authorized agent for the Secretary of Housing and Urban Development acting by and through the Federal Housing Commissioner, the person who executed the foregoing instrument by virtue of the authority vested in him by 24 C.F.R. 200.96 and acknowledged the same to be his free and voluntarily act and deed as authorized agent for and on behalf of the Secretary of Housing and Urban Development.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Cleveland, Ohio, this _24 TH_ day of May, 1973.

_Charles H. Kelly_
Notary Public      Charles H. Kelly
Commission Expires, Sept 26, 1976

Schedule A - Legal Description
            attached

EXHIBIT A


Situated in the City of Kent, County of Portage, and State of Ohio, and known as being part of Franklin Township Lot 7, being known as lots 170 and 171 of Henry Ainsworth Addition, as recorded in Deed Volume 88, Page 43, Portage County Records, and further described as follows: Beginning at an iron pin in the south right of way of Cherry Street, at the north east corner of lot 170 of above mentioned allotment, thence S. 0° 43' W., along the east line of lot 170, 390 feet to an iron pin in the south line of the allotment; thence N. 89° 35' W., along the south line of the allotment, 240 feet to an iron pin at the southwest corner of lot 171; thence N. 0° 43' E., along the west line of lot 171, 390 feet to an iron pin in the south right of way of Cherry Street; thence S. 89° 35' E., along the south right of way of Cherry Street, 240 feet to the beginning and containing 2.1487 acres as surveyed by Raymond L. Dray, Professional Surveyor 5476, 15, March, 1973, be the same more or less but subject to all legal highways.

FHA Form No. 3254
Rev. Oct., 1969
(Prior revisions obsolete)

U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
FEDERAL HOUSING ADMINISTRATION

## REGULATORY AGREEMENT FOR NON PROFIT AND PUBLIC MORTGAGORS
## UNDER SECTION 221(d)(3) OF THE NATIONAL HOUSING ACT, AS AMENDED

Project No.    042-35109

Mortgagee    Federal National Mortgage Association

Amount of Mortgage Note    $661,100.00                                          Date    May 29, 1973

Mortgage: Recorded: May 30, 1973    State Ohio    County Portage    Date    May 29, 1973

Book    965    Page    571-575

This Agreement entered into this    12th    day of    July    , 1996 ,

between    Cherry Affordable Housing, Inc., a District of Columbia Non-Profit Corporation

whose address is c/o The NHP Foundation, 1090 Vermont Avenue, N.W., Suite 400
Washington, DC 20005

their successors, heirs, and assigns (jointly and severally; hereinafter referred to as Owners) and the undersigned
Secretary of Housing and Urban Development and his successors, acting by and through the Federal Housing Commission-
er (hereinafter called Commissioner).

In consideration of the endorsement for insurance by the Commissioner of the above described note or in consider-
ation of the consent of the Commissioner to the transfer of the mortgaged property, and in order to comply with the require-
ments of Section 221(d)(3) of the National Housing Act, as amended, and the Regulations adopted by the Commissioner
pursuant thereto, Owners agree for themselves, their successors, heirs and assigns, that in connection with the mortgaged
property and the project operated thereon and so long as the contract of mortgage insurance continues in effect, and
during such further period of time as the Commissioner shall be the owner, holder or reinsurer of the mortgage, or dur-
ing any time the Commissioner is obligated to insure a mortgage on the mortgaged property:

1. Owners, except as limited by paragraph 18 hereof, shall promptly make all payments due under the note and
mortgage.

2. (a) Owners shall establish or continue to maintain a reserve fund for replacements by the allocation to such
reserve fund in a separate account with the mortgagee or in a safe and responsible depository designated by
the mortgagee, concurrently with the beginning of payments towards amortization of the principal of the mort-
gage insured or held by the Commissioner of an amount equal to $
per month unless a different date or amount is approved in writing by the Commissioner. Such fund, whether in
the form of a cash deposit or invested in obligations of, or fully guaranteed as to principal by, the United States
of America, shall at all times be under the control of the mortgagee. Disbursements from such fund, whether
for the purpose of effecting replacement of structural elements and mechanical equipment of the project or for
any other purpose, may be made only after receiving the consent in writing of the Commissioner. In the event
of a default in the terms of the mortgage, pursuant to which the loan has been accelerated, the Commissioner
may apply or authorize the application of the balance in such fund to the amount due on the mortgage debt as
accelerated.

(b) Where Owners are acquiring a project already subject to an insured mortgage, the reserve fund for replace-
ments to be established will be equal to the amount due to be in such fund under existing agreements or char-
ter provisions at the time Owners acquire such project, and payments hereunder shall begin with the first pay-
ment due on the mortgage after acquisition, unless some other method of establishing and maintaining the fund
is approved or required in writing by the Commissioner.

(c) Owners shall establish and maintain, in addition to the reserve fund for replacements, a residual receipts
fund by depositing thereto, with the mortgagee, the residual receipts, as defined herein, within 60 days after
the end of the semiannual or annual fiscal period within which such receipts are realized. Residual receipts
shall be under the control of the Commissioner, and shall be disbursed only on the direction of the Commissioner,
who shall have the power and authority to direct that the residual receipts, or any part thereof, be used for such
purpose as he may determine.

3. Real property covered by the mortgage and this Agreement is described in Schedule A attached hereto.

4.  The Owners covenant and agree that:

(a)  Admission to the project shall be limited to families having a low or moderate income which does not exceed the limits established by the Commissioner and in effect at the time of admission;

(b)  Preference or priority for admission to the project and for placement on the waiting list, which Owners shall maintain, shall be extended to those families of low or moderate incomes who have certificates of eligibility as displaced families;

(c)  On forms approved by the Commissioner they will obtain from each prospective tenant a certification of income prior to admission to the project, and a recertification of income from each tenant at least every two years following the date of admission;

(d)  If any recertification discloses that family income exceeds the limits established by the Commissioner and in effect at the time of recertification, they shall either terminate the lease, or require the tenant to pay an increased rental in an amount computed in accordance with the formula prescribed by the Commissioner;

(e)  They shall require all tenants to execute a lease in the form prescribed by the Commissioner, and shall not rent any unit in the project for less than 30 days nor more than one year;

(f)  The rent charged for each unit shall not exceed the upper limit of the range shown for such type of unit on the rental schedule approved in writing by the Commissioner, and shall include the reasonable use of all utilities shown on said schedule, but in no event shall the total gross monthly rents for all dwelling units exceed the gross monthly dwelling income for all units approved by the Commissioner on the rental schedule;

(g)  No increase will be made in the amount of the gross monthly dwelling income for all units as shown on the rental schedule unless such increase is approved by the Commissioner, who will at any time entertain a written request for an increase properly supported by substantiating evidence and within a reasonable time shall:

(1)  Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance expenses over which Owners have no effective control, or

(2)  Deny the increase stating the reasons therefor;

(h)  They will rent commercial facilities, if any, at not less than the rental approved by the Commissioner;

(i)  If there are rent supplement units in the project, the determination as to the eligibility of tenants for admission to such units and the conditions of continued occupancy shall be in accordance with the Rent Supplement Contract executed by the Owners and the Commissioner which is incorporated in and made a part of this Agreement;

(j)  In selecting tenants they shall not discriminate against any person or persons by reason of the fact that there are children in the family.

5.  Upon prior written approval of the Commissioner, the Owners may charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between the tenant and the Owners for any facilities and/or services which may be furnished by the Owner or others to such tenant upon his request in addition to the facilities and services included in the approved Rental Schedule.

6.  Owners agree that no dividends of any kind will be paid on the capital stock issued by the corporation, except as the charter may authorize due to domiciliary requirements.

7.  Owners shall not without the prior written approval of the Commissioner:

(a)  Convey, transfer, or encumber any of the mortgaged property, or permit the conveyance, transfer or encumbrance of such property;

(b)  Assign, transfer, dispose of, encumber any personal property of the project, including rents, or pay out any funds, except for reasonable operating expenses and necessary repairs;

(c)  Convey, assign, or transfer any beneficial interest in any trust holding title to the mortgaged property, or the interest of any general partner in a partnership owning the mortgaged property, or any right to manage or receive the rents and profits from the mortgaged property;

(d)  Remodel, add to, reconstruct, or demolish any part of the mortgaged property or subtract from any real or personal property of the project;

(e)  Engage in any other business or activity, including the operation of any other rental project, or incur any liability or obligation not in connection with the project;



(f) Require, as a condition of the occupancy or leasing of any unit in the project, any consideration or deposit other than the prepayment of the first month's rent plus a security deposit in an amount not in excess of one month's rent to guarantee the performance of the covenants of the lease. Any fund collected as security deposits shall be kept separate and apart from all other funds of the project in a trust account the amount of which shall at all times equal or exceed the aggregate of all outstanding obligations under said account;

(g) Permit the use of the dwelling accommodations of the project for any purpose except the use which was originally intended, or permit commercial use greater than that originally approved by the Commissioner;

(h) Incur any liability, direct or contigent, other than for current operating expenses, exclusive of the indebtedness secured by the mortgage and necessarily incident to the execution and delivery thereof;

(i) Pay any compensation, including wages or salaries, or incur any obligations, to themselves, or any officers, directors, stockholders, trustees, partners, beneficiaries under a trust, or to any of their nominees;

(j) Enter into any contract or contracts for supervisory or managerial services.

8. Owners shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good repair and condition. In the event all or any of the buildings covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the insured mortgage.

9. Owners shall not file any petition in bankruptcy, or for a receiver, or in insolvency, or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors or permit an adjudication in bankruptcy, the taking possession of the mortgaged property or any part thereof by a receiver, or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power of sale and fail to have such adverse actions set aside within forty-five days.

10.(a) Owners shall provide for the management of the project in a manner satisfactory to the Commissioner. Any management contract entered into by Owners, or any of them, involving the project shall contain a provision that it shall be subject to termination, without penalty and with or without cause, upon written request by the Commissioner addressed to the Owners. Upon receipt of such request Owners shall immediately terminate the contract within a period of not more than thirty (30) days and shall make arrangements satisfactory to the Commissioner for continuing proper management of the project.

(b) Payment for services, supplies, or materials shall not exceed the amount ordinarily paid for such services, supplies, or materials in the area where the services are rendered or the supplies or materials furnished.

(c) The mortgaged property, equipment, buildings, plans, offices, apparatus, devices, books, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and shall be subject to examination and inspection at any reasonable time by the Commissioner or his duly authorized agents. Owners shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by the Commissioner or his duly authorized agents.

(d) The books and accounts of the operations of the mortgaged property and of the project shall be kept in accordance with the requirements of the Commissioner.

(e) Within sixty days following the end of each fiscal year the Commissioner shall be furnished with a complete annual financial report based upon an examination of the books and records of the mortgagor prepared in accordance with the requirements of the Commissioner, certified to by an officer or responsible Owner and, when required by the Commissioner, prepared and certified by a Certified Public Accountant, or other person acceptable to the Commissioner.

(f) At the request of the Commissioner, his agents, employees, or attorneys, the Owners shall furnish monthly occupancy reports and shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contracts, operation, and condition of the property and the status of the insured mortgage.

(g) All rents and other receipts of the project shall be deposited in the name of the project in a bank, whose deposits are insured by the F.D.I.C. Such funds shall be withdrawn only in accordance with the provisions of this Agreement for expenses of the project. Any owner receiving funds of the project shall immediately deposit such funds in the project bank account and failing so to do in violation of this Agreement shall hold such funds in trust. Any owner receiving property of the project in violation of this Agreement shall immediately deliver such property to the project and failing so to do shall hold such property in trust.

11. Owners will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, creed, or national origin, including Title VI of the Civil Rights Act of 1964 (Public Law 88-352, 78 Stat. 241), all requirements imposed by or pursuant to the Regulations of the Department of Housing and Urban Development (24 CFR, Subtitle A, Part 1) issued pursuant to that title, and regulations issued pursuant to Executive Order 11063.



-4-

12. Upon a violation of any of the above provisions of this Agreement by Owners, the Commissioner may give written notice thereof to Owners, by registered or certified mail, addressed to the addresses stated in this Agreement, or such other addresses as may subsequently, upon appropriate written notice thereof to the Commissioner, be designated by the Owners as their legal business address. If such violation is not corrected to the satisfaction of the Commissioner within thirty days after the date such notice is mailed or within such further time as the Commissioner reasonably determines is necessary to correct the violation, without further notice the Commissioner may declare a default under this Agreement effective on the date of such declaration of default and upon such default the Commissioner may:

(a) (1) If the Commissioner holds the note - declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the mortgage;

(2) If said note is not held by the Commissioner - notify the holder of the note of such default and request the holder to declare a default under the note and mortgage, and the holder after receiving such notice and request, but not otherwise, at its option, may declare the whole indebtedness due, and thereupon proceed with foreclosure of the mortgage, or assign the note and mortgage to the Commissioner as provided in the Regulations;

(b) Collect all rents and charges in connection with the operation of the project and use such collections to pay the mortgagor's obligations under this Agreement and under the note and mortgage and the necessary expenses of preserving the property and operating the project;

(c) Take possession of the project, bring any action necessary to enforce any rights of the Owners growing out of the project operation, and operate the project in accordance with the terms of this Agreement until such time as the Commissioner in his discretion determines that the Owners are again in a position to operate the project in accordance with the terms of this Agreement and in compliance with the requirements of the note and mortgage;

(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Commissioner arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

13. As security for the payment due under this Agreement to the reserve fund for replacements, and to secure the Commissioner because of his liability under the endorsement of the note for insurance, and as security for the other obligations under this Agreement, the Owners respectively assign, pledge and mortgage to the Commissioner their rights to the rents, profits, income and charges of whatever sort which they may receive or be entitled to receive from the operation of the mortgaged property, subject, however, to any assignment of rents in the insured mortgage referred to herein. Until a default is declared under this Agreement, however, permission is granted to Owners to collect and retain under the provisions of this Agreement such rents, profits, income, and charges, but upon default this permission is terminated as to all rents due or collected thereafter.

14. As used in this Agreement the term:

(a) "Mortgage" includes "Deed of Trust", "Chattel Mortgage", and any other security for the note identified herein, and endorsed for insurance or held by the Commissioner;

(b) "Mortgagee" refers to the holder of the mortgage identified herein, its successors and assigns;

(c) "Mortgagor" means the original borrower under the mortgage and its successors and assigns;

(d) "Owners" refers to the persons named in the first paragraph hereof and designated as Owners, their successors or assigns; such term includes a nonprofit corporation executing this Agreement in its capacity as a contract purchaser of the project pursuant to a Sales Agreement with a Builder-Seller mortgagor;

(e) "Mortgaged Property" includes all property, real, personal, or mixed, covered by the mortgage or mortgages securing the note endorsed for insurance or held by the Commissioner;

(f) "Project" includes the mortgaged property and all its other assets of whatsoever nature or wheresoever situate, used in or owned by the business conducted on said mortgaged property, which business is providing housing and other such activities as are incidental thereto;

(g) "Residual Receipts" means any cash remaining after:

(1) the payment of:

(i) All sums due or currently required to be paid under the terms of any mortgage or note insured or held by the Federal Housing Commissioner;

(ii) All amounts required to be deposited in the reserve fund for replacements;

-5-

(iii) All obligations of the project other than the mortgage insured or held by the Commissioner unless funds for payment are set aside or deferment of payment has been approved by the Commissioner; and

(2) the segregation of:

(i) An amount equal to the aggregate of all special funds required to be maintained by the project;

(ii) All tenant security deposits held;

(h) "Family" means (1) two or more persons related by blood, marriage, or operation of law who occupy the same unit; (2) a handicapped person who has a physical impairment which is expected to be of long continued and indefinite duration, substantially impedes his ability to live independently, and is of such a nature that his ability could be improved by more suitable housing conditions; (3) a single person, 62 years of age or older; or (4) a single person less than 62 years of age provided that occupancy by such persons is limited to 10% of the dwelling units in the project, unless the occupants receive rent supplement benefits pursuant to a rent supplement contract in which instance the 10 percent limitation shall not be applicable.

(i) "Income" means the gross annual income of the family from all sources before taxes and withholding, after giving effect to exclusions allowed by the Commissioner;

(j) "Default" means a default declared by the Commissioner when a violation of this Agreement is not correcented to his satisfaction within the time allowed by this Agreement or such further time as may be allowed by the Commissioner after written notice.

15. This instrument shall bind, and the benefits shall inure to, the respective Owners, their heirs, legal representatives, executors, administrators, successors in office or interest, and assigns, and to the Commissioner and his successors so long as the contract of mortgage insurance continues in effect, and during such further time as the Commissioner shall be the owner, holder, or reinsurer of the mortgage, or obligated to reinsure the mortgage.

(a) In the event this Agreement is executed by a nonprofit corporation in its capacity as a contract purchaser of the project pursuant to a Sales Agreement with a Builder-Seller mortgagor, it agrees that all of the provisions hereof shall continue to bind it in its capacity as title owner of the project upon consummation of the purchase. In the event the purchase is not consummated at final endorsement or such later time as may be agreed to in writing by the Commissioner, its obligations hereunder shall terminate.

16. Owners warrant that they have not, and will not, execute any other agreement with provisions contradictory of, or in opposition to, the provisions hereof, and that, in any event, the requirements of this Agreement are paramount and controlling as to the right and obligations set forth and supersede any other requirements in conflict therewith.

17. The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof.

18. The following Owners:

do not assume personal liability for payments due under the note and mortgage, to the reserve for replacements, or for matters not under their control, provided that such Owners shall remain liable under this Agreement only with respect to the matters hereinafter stated; namely:

(a) for funds or property of the project coming into their hands which, by the provisions hereof, they are not entitled to retain; and

(b) for their own acts and deeds or acts and deeds of others which they have authorized in violation of the provisions hereof.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date first hereinabove written.

Cherry Affordable Housing, Inc.

Owners

Seal

Witness

By _____
Ghebre Selassie Mehreteab
President

SECRETARY OF HOUSING AND URBAN DEVELOPMENT
acting by and through the FEDERAL HOUSING COMMISSIONER

Catherine F. Mack

By _____
Authorized Agent

(Add proper acknowledgements)
255266-P



PROJECT NAME: Cherry Estates
PROJECT LOCATION: Kent Ohio
PROJECT NUMBER: 042-35109


USE AGREEMENT AND AMENDMENT OF EXISTING REGULATORY AGREEMENT
FOR MULTIFAMILY PROJECTS INSURED OR ASSISTED ~~~~
UNDER SECTION 221(D)(3) (~~BELOW MARKET INTEREST RATE~~) OF
THE NATIONAL HOUSING ACT AND SUBJECT TO THE
LOW-INCOME HOUSING PRESERVATION AND
RESIDENT HOME OWNERSHIP ACT OF 1990
WITH A CAPITAL GRANT AND SALE
OF PROPERTY


This Agreement, entered into by the Secretary of Housing and Urban Development (the "Secretary" or "HUD"), and Cherry Affordable Housing, Inc.("Owner") provides as follows:

WHEREAS, Cherry Estates Apartments ("Project"), a 48 unit project located in Kent, Ohio was financed with a Secured Note (the "Mortgage Note") and Mortgage (the "Mortgage") and insured by the Secretary under Section 221(d)(3) and (d)(5) of the National Housing Act, 12 U.S.C. Section 1715l(d)(3) and (d)(5), and covering real property as described in Exhibit "A" attached hereto, which Mortgage was recorded in the Recorder's Office of Portage County on May 30, 1973 as Instrument Number 15881, in Volume 965, pages 571-575;

WHEREAS, the Project is subject to a Regulatory Agreement or any amendments thereto, (the "Regulatory Agreement"),of even date herewith;

WHEREAS, the Owner is eligible to prepay the mortgage and the Project is subject to the provisions of the Low-Income Housing Preservation and Resident HOME OWNERSHIP Act of 1990 ("LIHPRHA"), 12 U.S.C. 4101 *et seq.*, as amended, because it meets the definition of "eligible low-income housing" in LIHPRHA;

WHEREAS, pursuant to LIHPRHA, the Owner has requested, and HUD has agreed to provide certain incentives, as set forth herein, in exchange for the Owner's agreement to continue low-income afford ability restrictions on the Project for the remaining useful life of the Project;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the parties hereby agree as follows:


1.    Definitions

a. "Low-Income Tenants" are persons or families whose incomes are more than 50 percent but not more than 80 percent of Median Income as determined by HUD with adjustments for smaller or larger families.

b. "Moderate Income Tenants" are persons or families whose incomes are more than 80 percent of Median Income but not more than 95 percent of Median Income as determined by HUD with adjustment for smaller or larger families.

c. "Plan of Action" is that document submitted by the Owner, and approved by HUD, pursuant to LIHPRHA requesting incentives in exchange for maintaining the low and moderate income character of the Project for its remaining useful life.

d. "Remaining Useful Life" is the period during which the physical characteristics of the Project remain in a condition suitable for occupancy, assuming normal maintenance and repairs are made and major systems and capital components are replaced as becomes necessary.

e. "Very Low-Income Tenants" are persons or families whose incomes are not more than 50 percent of Median Income as determined by HUD with adjustments for smaller and larger families.

2. **Term.** This Agreement shall remain in effect for the Remaining Useful Life of the Project, as that term is defined in Paragraph 1 of this Agreement. The Owner may petition HUD to make a determination that the remaining useful life of the Project has expired not less than fifty years from the date of approval of the Plan of Action for the Project. In making such a determination, HUD shall presume that the useful life of the Project has not expired, and the Owner shall have the burden of proof in establishing such expiration. HUD will not determine that the useful life of the Project has expired if such determination results primarily from failure to make regular and reasonable repairs and replacement, as become necessary. Tenants and interested persons and organizations may provide comments on the Owner's petition and may appeal HUD's determination.

3. **Use Restriction.** The Project shall be used solely as rental housing for Very Low-, Low- and Moderate-Income Tenants, except to the extent that commercial use has been approved by the Commissioner. If there is any approved commercial use or non-residential units in the Project, rents from the units receiving Section 8 assistance shall not be used to pay any expenses incurred with respect to the commercial use or non-residential units.

3

4.    Maintenance of Afford ability.

a.  Paragraphs 4(a), (d), (f), (g), (h), and (i) of the Regulatory Agreement are deleted in their entirety.  The Owner, to the extent practicable, will maintain the Project as affordable to the following proportions of Very Low-, Low- and Moderate-Income Tenants:

|                            | No. of Units |
|----------------------------|--------------|
| Very Low-Income Tenants    | 45           |
| Low-Income Tenants         | 0            |
| Moderate-Income Tenants    | 2            |

In renting vacant units to new tenants, the Owner may deviate from the above Tenant Profile to the extent necessary to keep the project financially viable, only with the approval of HUD.

b.  The Owner may rent to a higher proportion of Very Low-Income Tenants than required by the foregoing tenant income profile.  However, HUD does not agree to provide Section 8 assistance beyond that which is already provided under an existing Section 8 assistance contract.

c.  No tenant in occupancy as of the effective date of this Agreement ("Current Tenant(s)") shall be required to relocate on the basis of his or her income.

d.  Paragraph 4(b) of the Regulatory Agreement is amended to read as follows:

> To the extent that it does not conflict with the tenant income profile established in Section 222 of LIHPRHA, preference for occupancy shall be given to those families displaced as a result of a major disaster as determined by the President or as a result of governmental action;

5.    Distributions and Amendment of Regulatory Agreement. Paragraph 6 of the Regulatory Agreement is amended to read as follows:

The Owner shall not make, or receive and retain, any distribution of assets or any income of any kind of the project except on the following conditions:

> All distributions shall be made only as of or after the end of a semiannual or annual fiscal period, and only as permitted by the law of the applicable jurisdiction; all such distributions in any one fiscal year shall be no more than $ 00.00 and the right to such distributions shall be cumulative.

4

6.  **Reserve for Replacements and Amendment of Regulatory Agreement.**  Paragraph 2(a) of the Regulatory Agreement is amended by adding the following language to the end thereof:

> The Secretary will not approve the release of funds from the Reserve for Replacements account if doing so would reduce the balance below an amount equivalent to one month's maximum gross rent potential, except in emergencies requiring immediate repairs or to avoid a default on, or assignment of, the mortgage insured by the Commissioner.

7.  **Savings Due to Management Efficiencies.**  Any net savings from reductions in operating expenses due to management efficiencies as determined by the Secretary shall be deposited into the Reserve for Replacements Account.  The Owner may have access to these funds on a semiannual basis upon a finding by the Commissioner that a withdrawal will not reduce the balance in the Reserve for Replacements Account below that required in Paragraph 2(a) of the Regulatory Agreement, as amended by this Agreement, and that the Owner is maintaining the property in accordance with the Housing Quality Standards set forth in 24 CFR Part 886.

8.  **Displacement.**  No Current Tenant shall be displaced, except for good cause.

9.  **Civil Rights Requirements.**  The Owner will comply with the provisions of any Federal, State or local law prohibiting discrimination in housing on the basis of race, color, religion, sex, national origin, handicap or familial status, including but not limited to:  Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d-1), the Fair Housing Act (42 U.S.C. 3601), Executive Order 11063, Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), and all requirements imposed by or pursuant to the regulations of the Department of Housing and Urban Development implementing these authorities, including, but not limited, to 24 CFR Parts 1, 100, 107, and 110, and Subparts I and M of Part 200.

10.  **Housing Quality Standards.**  The Owner shall maintain the Project in good repair and condition in accordance with the applicable local codes.

11.  **Violations of this Agreement.**  If HUD determines that the Owner has violated the terms of this Agreement, including compliance with the Housing Quality Standards, HUD shall notify the Owner of its determination and the Owner shall have 90 days

5

in which to cure the violation. At the expiration of the 90 days, HUD shall reinspect the Project or take other investigative steps in order to ensure compliance. The failure to cure any violation within 90 days of notification of the violation may result in, but not be limited to, the forfeiture of, or reduction in, the Owner's annual distribution; reduction in, or suspension of, the Section 8 assistance, if any; acceleration of debt secured by the Project; payment of relocation expenses to tenants admitted to the Project inconsistently with the tenant income profile established in this Agreement; and the imposition of any other sanctions authorized in law.

12. **Agreement Binding Upon Successors and Assigns.** Upon conveyance of the Project during the term of this Agreement, the Owner shall require its successor or assignee to assume its obligations under this Agreement. In any event, this Agreement shall be binding upon the Owner's successors and assigns.

13. **Reports.** The Owner shall furnish the Secretary with such reports concerning the financial condition, operation and condition of the Project as the Secretary may prescribe.

14. **Reimbursement of Assistance.** If, within ten years of plan of action approval, the Owner becomes affiliated with, or transfers title in the Project to, a for-profit entity, the Secretary may seek reimbursement from the Owner for the difference between the amount of incentives approved in the plan of action and the amount of incentives which the for-profit entity would have been entitled to receive under LIHPRHA. Any owner receiving incentives or other property of the project in violation of this agreement shall immediately deliver such property to the project and failing to do so shall hold such property in trust.

15. **Incorporation of Regulatory Agreement by Reference.** Paragraphs 2(a), 2(c), 4(c), (4)(e), 4(j), 5, 6, 7(b), 7(d), 7(f), 7(g), 7(j), 10, 14 and 18 of the Regulatory Agreement (HUD Form 1733 dated 10/69), are adopted and incorporated by reference herein. In the event that the Owner prepays all mortgage note or notes as are described in the Regulatory Agreement or any Regulatory Agreement amendments or all FHA mortgage insurance is terminated, the provisions listed above shall remain in full force and effect, binding the Owner, its successors and assigns as if the Mortgage Note were not prepaid or the mortgage insurance terminated, except that in the case of such prepayment or termination:

6

a. the phrase "the Secretary" shall be substituted for the term "Mortgagee" throughout the adopted language of the Regulatory Agreement; and

b. the "mortgaged property" or "mortgaged premises" referred to in the Regulatory Agreement, shall be the Project.

16. **Enforcement.** In the event of a breach or threatened breach of any of the provisions of this Agreement, any eligible tenant or applicant for occupancy, or the Secretary or his or her successors or delegates, may institute proper legal action to enforce performance of such provisions, to enjoin any acts in violation of such provision and to recover damages (including refunds, with interest, on rent overcharges), and/or to obtain whatever other relief may be appropriate.

17. **Severability.** The invalidity, in whole or in part, of any provision of this Agreement shall not affect or invalidate any remaining provisions.

18. **Impairment of Regulatory Agreement.** The terms and provisions of the Regulatory Agreement shall continue in full force and effect except as modified herein. Conflicts between this Agreement and the Regulatory Agreement shall be resolved in favor of this Agreement.

19. **Execution of Other Agreements.** The Owner agrees that it has not and will not execute any other agreement with provisions contradictory of, or in opposition to, the provisions of this Agreement, and that in any event, the provisions of this Agreement are paramount and controlling as to the rights and obligations set forth and supersede any other conflicting requirements.

20. **Subsequent Statutory Amendments.** If revisions to the provisions of this Use Agreement are necessitated by subsequent statutory amendments, the Owner agrees to execute modifications to this Use Agreement that are needed to conform to the statutory amendments. In the alternative, at HUD's option, HUD may implement any such statutory amendment through rulemaking by amending 24 C.F.R. Part 248

7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and have agreed that it shall be effective as of the _____ day of _____, 19__.

CHERRY AFFORDABLE HOUSING, INC., a District of Columbia nonprofit corporation

_____
Witness
Jill Chessen

_____
Ghebre Selassie Mehreteab, President

_____
Witness
DouglasW. Shelby

SECRETARY OF HOUSING AND URBAN DEVELOPMENT

BY: __Acting_____
Director
Office of Multifamily Housing
HUD, __Cleveland__ Field Office

RECEIVED FOR RECORD
AT __14:23:40__ AM PM
9615212 =19 96
/26- 291:300
O.R. VOL. ____ PAGE ____
LINDA E. FANKHAUSER
PORTALE COUNTY RECORDER
FEE__46.00__

INDEXED

VOL 0126 PAGE 297

8

STATE OF  *Ohio*                     )
                                      )              SS:
COUNTY OF  *Cuyahoga*              )

    Before me, *Collette Appolito*, a Notary Public in and for
said State, on this _12_ day of _July_____, 19_96_,
personally appeared _Dennis G. Morton_, who is personally well
known to me to be the Director, _____, and
the person who executed the foregoing instrument by virtue of the
authority vested in him by Section 204(g) of the National Housing
Act, as amended, and I having first made known to him the
contents thereof, he did acknowledge the signing thereof to be
his free and voluntary act and deed on behalf of Henry G.
Cisneros, as the Secretary of Housing and Urban Development for
the uses, purposes and considerations therein set forth.


    Witness my hand and official seal this _12_ day of
_July_____, 19_96_.

(SEAL)


                                    *Collette Appolito*
                                      Notary Public
My commission expires _____, 19___.

                              COLLETTE A. POLITO, Notary Public
                              State Wide Jurisdiction, Ohio
                           My Commission Expires June 2, 1999

9

~~STATE OF~~ )
DISTRICT OF COLUMBIA )        ss:
~~COUNTY OF~~ )

On this 10th day of July_____, A.D., 1996, before me,
a Notary Public in and for said county and State, residing
therein, duly commissioned and sworn, personally appeared Ghebre
Selassie Mehreteab, and proved to me on the basis of satisfactory
evidence to be the President of the corporation that executed the
within instrument and acknowledged to me that such corporation
executed the same.


IN WITNESS WHEREOF, I have hereunto set my hand and affixed
my official seal the day and year in this Certificate first above
written.

_____
NOTARY PUBLIC


(SEAL)              My Commission Expires May 14, 2000

My Commission expires _____, 19___.

VOL. 0126 PAGE 299

Prep by
Jill Chessen

## EXHIBIT A

Situated in the City of Kent, County of Portage and State of Ohio:  and known and described as Lot No. one hundred seventy (170) in Henry Ainsworth Addition to the Village of Kent as the same is platted and recorded in Deed, Volume 88, Page 43 of the public records of said Portage County

Situated in the City of Kent, County of Portage and State of Ohio, and known and described as Lot No. one hundred seventy-one (171) in Henry Ainsworth Addition to the Village of Kent as the same is platted and recorded in Deed, Volume 88, Page 43 of the public records of said Portage County

AND FURTHER DESCRIBED AS, Situated in the City of Kent, County of Portage and State of Ohio, and known as being part of Franklin Township Lot 7, being known as Lots 170 and 171 of the Henry Ainsworth Addition, as recorded in Deed Volume 88, page 43, Portage County Records, and further described as follows: Beginning at an iron pin in the south right of way of Cherry Street, at the Northeast corner of Lot 170 of above mentioned allotment; thence S. 0° 43' W., along the east line of Lot 170, 390 feet to an iron pin in the south line of the allotment; thence N. 89° 35' W., along the south line of the allotment, 240 feet to an iron pin at the southwest corner of Lot 171; thence N. 0° 43' E., along the west line of Lot 171, 390 feet to an iron pin in the south right of way of Cherry Street; thence S. 89° 35' E., along the south right of way of Cherry Street, 240 feet to the beginning and containing 2.1487 acres as surveyed by Raymond L. Dray, Professional Surveyor 5476, March 15, 1973, be the same more or less, but subject to all legal highways.

23090760

VOL 0126 PAGE 300