**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MILLENNIA HOUSING MGMT., *et al.*, | ) | CASE NO. 1:24-cv-02084 |
| Plaintiffs, | ) | |
| | ) | |
| | ) | JUDGE DAN AARON POLSTER |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOUSING AND URBAN DEVELOPMENT, | ) | **MEMORANDUM OPINION & ORDER** |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is the latest in an ever-growing list of cases challenging the structure and administration of federal agency administrative proceedings. While these types of cases have existed for nearly 100 years, going back to the passage of the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.*, the Supreme Court's recent decision in *SEC v. Jarkesy*, 603 U.S. 109 (2024), sparked an increase in litigation in this area. Most of these cases are retrospective; that is, the agency proceeding at issue has already occurred, and the plaintiffs are seeking relief that redresses their alleged injuries from that proceeding. In this case, however, the plaintiff is seeking prospective relief from an agency proceeding scheduled for June 2025.

Plaintiffs[1] here have brought this suit against the Department of Housing and Urban Development ("HUD")[2]. They make three constitutional claims, the first two of which are

---

[1] Cherry Estates LP; Cherry Estates Investment, LLC; Flushing Elmcrest Limited Dividend Housing Association Limited Partnership; Elmcrest Investment, LLC; Covenant Apartments LP; Covenant Apartments Investment, LLC; Covenant Project, LLC; Bethel Tower Limited Dividend Housing Association Limited Partnership; Bethel Tower Investment, LLC; Trail West, Ltd.; Trail West Investment, LLC; Trail West Housing Partners, Inc.; Robinson Heights Apartments I, LP; Robinson Heights Apartments Investment I, LLC; Hickory Creek Estates, Ltd.; Hickory Creek Estates Investment, LLC; Sherman Thompson OH, TC, L.P.; Sherman Thompson Towers Investment, LLC; Highland Place Associates I, Ltd.; Highland Place Investment I, LLC; Petosky Riverview Limited Dividend Housing Association Limited Partnership; Petoskey Riverview Investment, LLC; Oakdale Estates, Ltd.; Oakdale Estates II Investment, LLC; Oakdale Estates Investment GP, LLC; Oakdale Estates Investment LLC; Morning Star

interrelated: 1) in-house agency administrative proceedings that can result in the imposition of a civil monetary penalty violate the Seventh Amendment; 2) these in-house agency proceedings usurp judicial power in violation of Article III; and 3) the dual-level removal scheme for Administrative Law Judges ("ALJs") improperly tramples on the president's executive powers in violation of Article II.

For the reasons discussed herein, this Court **DISMISSES** the Seventh Amendment and Article III claims for lack of jurisdiction. Even if this Court had jurisdiction, however, it would **DENY** Plaintiffs' motion for permanent injunctive relief and declaratory judgment on those claims. Further, this Court **DENIES** Plaintiffs' motion for permanent injunctive relief and declaratory judgment on the Article II claim. Since both parties agree that "no discovery is necessary in this matter, which presents a purely legal question with no triable issues of fact," ECF 17 ¶ 1, this Court finds it appropriate to therefore *sua sponte* **GRANT** summary judgment in favor of the Government on all claims. *See* FED. R. CIV. P. 56(f); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (holding that "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence"); *Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 959-60 (6th Cir. 2007) ("The key inquiry is whether the losing

---

Tower, Ltd.; Morning Star Tower Investment, LLC; International Towers I Ohio, Ltd.; International Tower Investment I, LLC; YMHA Housing Preservation, LLC; Kingsbury Tower I, Ltd; Kingsbury Tower Investment I, LLC; Hunter's Run Investment, LLC; Halton HR Investors, LLC; HWFB HR Investment, LLC; Halton Springs Investments, LLC; Millennia Housing Management, Ltd. ("Millennia Housing Management") (collectively, "Millennia Companies"); and Frank Sinito (collectively, "Plaintiffs").

[2] Plaintiffs in this case are also suing the HUD Office of Hearings and Appeals ("OHA"), the current Acting Secretary of HUD, the Assistant Secretary for Housing, Federal Housing Commissioner, general counsel for HUD, and Alexander Fernandez-Pons in his official capacity as an ALJ at HUD. Since all individual defendants are government employees being sued in their official capacities as HUD officials, this Order and Opinion will collectively refer to all defendants as "HUD" or "the Government" for ease of reference.

party was on notice that he had to muster the necessary facts to withstand summary judgment, lest he face the dismissal of his claims.").

## I.  BACKGROUND

### A.  STATUTORY BACKGROUND

The Federal Housing Administration ("FHA") was established by Congress in 1934 with the passage of the National Housing Act. 12 U.S.C. §§ 1701 *et seq*. Now a component of HUD, the FHA administers various insurance programs to encourage the construction of affordable multifamily housing. One of these programs allows for HUD and the FHA to insure certain mortgages for the purchase or refinancing of existing multifamily housing projects. *See id.* § 1715n(f). This allows for more favorable interest rates and other terms than may otherwise be available by insuring lenders against the risk of loss from mortgage defaults. ECF 17 ¶ 45. This, in turn, encourages investment in higher-risk properties in underserved areas by reducing developers' financing costs, assuming some or all of the interest rate risks, and helping to sustain the profitability of these projects. *Id.* ¶¶ 46-47.

Mortgagors participating in this program enter into Regulatory Agreements with HUD, under which the mortgagor agrees to comply with certain requirements. This can include statutory and regulatory provisions, as well as additional obligations. *Id.* ¶ 48. In addition, mortgagors and their management agents also execute Project Owner's/Management Agent's Certifications ("POMAC"). These include certifying that the signors will "comply with HUD requirements and contract obligations," and acknowledging that HUD "may seek additional civil money penalties to be paid by mortgagor through personal funds for: . . . [c]ertain specific violations of the Regulatory Agreements," citing to the relevant statutes permitting the civil penalties. *Id.* ¶ 49. Following Congressional adjustments for inflation, the current penalty

3

amount is $61,238 per occurrence.[3] *Id.* n.1; *see also* Adjustment of Civil Monetary Penalty Amounts for 2024, 89 Fed. Reg. 13614 (Feb. 23, 2024).

HUD's ability to impose civil money penalties against mortgagors and certain other closely related parties for multifamily properties with FHA-insured mortgages derives from Section 537 of the HUD Reform Act of 1989, Pub. L. No. 101-235, 103 Stat. 1987. In relevant part, Section 537 provides that HUD may impose civil money penalties on a mortgagor or closely related party "that knowingly and materially" engages in "[a]ssignment, transfer, disposition, or encumbrance of any personal property of the project, including rents, other revenues, or contract rights, or paying out of any funds, except for reasonable operating expenses and necessary repairs, without prior written approval of the Secretary." 12 U.S.C. § 1735f-15(c)(1)(B)(ii). If HUD believes that a mortgagor or its agents have violated this provision, it may institute administrative proceedings within the agency, to be heard by an ALJ. *See id.* § 1735f-15(d)(1). These proceedings are subject to the APA, 5 U.S.C. § 551 *et seq.*, and additional regulations established by the HUD Secretary in accordance with statutory requirements, 24 C.F.R. § 30.95. *See also* 24 C.F.R. §§ 26.28-56 (establishing procedures for hearings pursuant to the APA).

There are several procedural steps that HUD must go through before it may impose civil monetary penalties. First, HUD must issue a "Prepenalty Notice" to the respondent that identifies the specific alleged violations and the maximum potential penalty, and inviting the submission of a response within thirty days. *See id.* § 30.70. After that thirty-day period, and upon

---

[3] When the HUD Reform Act of 1989 was first enacted, the statutory maximum for the civil monetary penalty was $25,000 per offense. Notwithstanding the original statutory language, the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584, 599-601, which further amended the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890, requires agencies to make annual adjustments to civil monetary penalty amounts for inflation. The 2024 adjustment, 89 Fed. Reg. 13614, establishes the current adjusted civil monetary penalty amount.

consideration of any response filed, HUD may decide to issue a complaint with the HUD Office of Hearings and Appeals ("OHA"). The complaint must set forth the factual and legal basis for the penalty, state the amount sought, and inform the respondent of its right to request a hearing on the complaint in writing within fifteen days. *See id.* § 30.85. If respondent requests a hearing, they have thirty days to file an answer to the complaint and begin the ALJ hearing process. *See id.* §§ 30.90-95.

Pursuant to HUD regulations, a civil monetary penalties hearing follows the same procedures as HUD hearings conducted in accordance with the APA. *See id.* § 30.95. Those procedures provide that the hearing will be presided over by an ALJ, *id.* § 26.32, who finds facts, determines conclusions of law, and determines whether the claims are supported by the evidence presented, *id.* §§ 26.45(e), 26.50. The Federal Rules of Evidence "provide guidance" to the ALJ, but are not binding. *See id.* § 26.47. Either party may appeal the ALJ's determination to the Secretary of HUD. *See id.* § 26.52(a), (k); *see also* 12 U.S.C. § 1735f-15(d)(1)(C). After exhausting this administrative remedy, the affected party may seek review of the final agency action in the appropriate federal court of appeals. *See* 12 U.S.C. § 1735f-15(e).

## B. FACTUAL BACKGROUND

Plaintiffs in this case are entities that develop, own, and manage multifamily housing projects across the country, including a variety of HUD-insured properties pursuant to Section 221 of the National Housing Act. ECF 17 ¶¶ 65-66; *see also* 12 U.S.C. §§ 1715*l*, 1715n (codifying Section 221 of the National Housing Act). These properties are all managed by Plaintiff Millennia Housing Management, and owned by single-asset entities in which Plaintiff Frank Sinito has a direct or indirect ownership stake. Each of the remaining plaintiffs is either the mortgagor-owner entity of one of these properties or a partner in a mortgagor-owned entity.

5

ECF 1 ¶ 49. Each of the Plaintiffs are either the owner and mortgagor of a HUD-financed property, a general partner in the entity that owns the property, the management agent for the property, or the ultimate beneficial owner of the entities. ECF 17 ¶ 67.

During a 2023 HUD review of bank statements and other financial documents in Plaintiffs' files related to a selection of the Millennia Companies' properties subject to HUD contracts, HUD identified what it alleges are "numerous potential violations of statutory and regulatory requirements," including potential repeated violations of the prohibition on dispensing funds without prior written approval. ECF 9 at 8. Between February 21, 2024, and April 10, 2024, HUD filed sixteen complaints in the OHA against Plaintiffs (the "Complaints"). The Complaints seek to impose civil monetary penalties of the maximum amount permitted by law for each alleged violation of the prohibition against unauthorized distributions under 12 U.S.C. § 1735f-15 and 24 C.F.R. Part 30. *See also* 24 C.F.R. §30.45(g). In total, HUD seeks more than $7 million in civil money penalties against Plaintiffs. ECF 17 ¶ 72.

All sixteen properties identified in the administrative complaints are subject to a POMAC and a Regulatory Agreement. Twenty-one of the thirty-nine Plaintiffs have executed a POMAC with HUD containing the following language: "HUD may seek additional civil money penalties to be paid by mortgagor through personal funds for: . . . [c]ertain specific violations of the Regulatory Agreement, the penalties could be as much as $25,000 per occurrence (12 U.S.C. 1735f-15)."[4] Another ten Plaintiffs have entered into Regulatory Agreements, which include the following general obligations: mandating that the "[b]orrower shall comply with all applicable: laws; ordinances; regulations; requirements of any Governmental Authority"; providing that "HUD shall be entitled to invoke any remedies available by law to redress any breach or to

---

[4] The language in the POMACs quotes the specific statutory language. *See supra* note 3 for a discussion of the statutory language versus current civil monetary penalty amounts adjusted for inflation.

compel compliance by Borrower with these requirements, including any remedies available hereunder"; and, defining "Program Obligations" as "all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project . . . ." The POMACs and Regulatory Agreements signed by the remaining eight Plaintiffs do not contain this specific language. ECF 17 ¶¶ 68-71.

The Complaints were consolidated into a single action at Plaintiffs' request on May 2, 2024. In consolidating the actions, the ALJ found that each Complaint alleged that Plaintiffs made unauthorized distributions of project assets. *Id.* ¶ 78. Plaintiffs filed initial answers to each of the Complaints on May 22, 2024. They subsequently filed Amended Answers to each of the Complaints, with permission from the ALJ, on August 1, 2024, in light of the Supreme Court's decision in *Jarkesy*. Proceedings before the ALJ are ongoing, and a hearing is currently scheduled for early June 2025.[5]

### C. PROCEDURAL HISTORY

Plaintiffs filed this action on November 27, 2024, seeking both injunctive and declaratory relief for an alleged violation of their Seventh Amendment right to a jury trial under *Jarkesy*, and a separation of powers violation arising under Article III of the Constitution. ECF 1. Specifically, they ask this Court to declare that "HUD OHA has no jurisdiction over the claims brought against Plaintiffs." *Id.* at 15. That same day, Plaintiffs also filed a motion for preliminary injunction to halt the scheduled June ALJ proceeding, as well as prevent "action in any administrative tribunal against Plaintiffs . . . for alleged violations of 12 U.S.C. § 1735f-15." ECF 3 at 3. HUD filed its response in opposition to Plaintiffs' motion for preliminary injunction on January 8, 2025. In that response, HUD argued that, as a preliminary matter, the Court lacks

---

[5] There is also an ongoing criminal investigation into Plaintiff Frank Sinito's withdrawal of funds. *See* ECF 9 at 9-10.

subject-matter jurisdiction over the Seventh Amendment and Article III claims, but even if the Court did have proper jurisdiction, Plaintiffs could not show a likelihood of success on the merits for a variety of reasons. ECF 9 at 1-2. Plaintiffs filed their reply in support of their motion on January 22, 2025; oral argument was held on February 13, 2025.

On February 21, 2025, Plaintiffs filed an amended complaint adding their Article II claim. They alleged that the dual layers of removal protections for HUD ALJs unconstitutionally interfered with the president's removal powers under Article II, and thus violated separation of powers. ECF 14 ¶¶ 92-102. Notably, Plaintiffs attached to their amended complaint a letter from Acting Solicitor General Sarah M. Harris to Senator Chuck Grassley stating that the Department of Justice "has concluded that the multiple layers of removal restrictions for [ALJs] . . . violate the Constitution, that the Department will no longer defend them in court, and that the Department has taken that position in ongoing litigation." ECF 14-3.

Following a discussion with the Court, the parties submitted a joint stipulation of facts and joint motion to convert the motion for a preliminary injunction into a motion for permanent injunction. ECF 17. The parties agreed that no discovery was necessary on any of the claims. The parties then proceeded to brief the Article II claim, with Plaintiffs filing their brief and motion for summary judgment on March 12, 2025. ECF 18. The Government filed its response on the Article II claim and opposition to Plaintiffs' motion for summary judgment on April 7, 2025, ECF 21, and Plaintiffs filed their reply on April 16, 2025, ECF 22.

With briefing on all of Plaintiffs' claims now complete, this matter is ripe for ruling.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see generally Celotex* 477 U.S. 317 (1986).

In order to be entitled to permanent injunctive relief, a plaintiff must demonstrate four things: 1) that it has suffered an irreparable injury; 2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and 4) that the public interest would not be disserved by a permanent injunction. *See, e.g.*, *Weinberger v. Romero—Barcelo*, 456 U.S. 305, 311–313 (1982); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Under 28 U.S.C. § 2201(a), a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." On the face of the statute, a declaratory judgment extends only to an "interested party" and has "the force and effect of a final judgment." *Id.*

## III. ANALYSIS

Before the Court can address the merits of Plaintiffs' constitutional claims, it must determine first whether it has jurisdiction to even hear them. "Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider" including "when, and under what conditions, federal courts can hear them." *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007). Ordinarily, district courts have original jurisdiction over cases with a "federal

question," meaning they arise under the Constitution or a federal statute. 28 U.S.C. § 1331. However, "Congress...may substitute for...district court authority an alternative scheme of review." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). Congress thus implicitly can substitute "by specifying a different method to resolve claims about agency action." *Id.* Or Congress explicitly can substitute "providing in so many words that district court jurisdiction will yield." *Id.*

HUD has a statutory review scheme that allows for judicial review of agency determinations, such as those made by an ALJ, by a U.S. Court of Appeals. *See* 12 U.S.C. § 1735f-15(e)(1). The challenging party must also exhaust all administrative remedies first, as required under HUD regulations, which includes appeal to the Secretary of HUD. 24 C.F.R. § 26.58. These types of review schemes are "typical[]," and "divest[] district courts of their ordinary jurisdiction over the covered cases." *Axon*, 598 U.S. at 185. A district court may only exercise jurisdiction if it concludes that plaintiffs' claims are not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994). In answering this question, the Court must consider the three *Thunder Basin* factors: (1) whether preclusion of review would "foreclose all meaningful judicial review"; (2) whether "the suit is 'wholly collateral to [the] statute's review provisions'"; and (3) whether "the claims are 'outside the agency's expertise.'" *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin*, 510 U.S. at 212-13). Since Plaintiffs bring multiple constitutional claims here, the Court must apply these factors individually to each of the claims. Only once the Court has determined that it can properly exercise jurisdiction can it proceed to rule on the merits of the claims.

## A.  SEVENTH AMENDMENT / ARTICLE III CLAIMS

Before considering the merits of Plaintiffs' arguments on these claims, the Court must first determine, through the application of the *Thunder Basin* factors, whether it has subject-matter jurisdiction to hear them. As discussed below, this Court lacks subject-matter jurisdiction over the Seventh Amendment and Article III claims. Even if the Court had jurisdiction, though, Plaintiffs' claims would still fail on the merits because the right to a jury is inapplicable to this type of OHA proceeding, and even if it were applicable, it would be precluded by the "public rights" exception.

### 1.  SUBJECT-MATTER JURISDICTION

#### i.   Does the statutory scheme foreclose all meaningful judicial review?

Adequate judicial review of an agency determination "does not usually demand a district court's involvement." *Axon*, 598 U.S. at 190. This is true even when the plaintiff or petitioner asserts constitutional claims. *See Elgin v. Dept. of Treasury*, 576 U.S. 1, 21 (2012) (holding that the Federal Circuit provided "meaningful review" "to consider and decide petitioners' constitutional claims"). It is irrelevant whether the agency itself "could not have considered or remedied the party's claim," or whether "the claim involves a matter of substance . . . or one of procedure." *Axon*, 598 U.S. at 190 n.2.

Plaintiffs argue that all their constitutional claims go to "the structure and essence of HUD's enforcement authority and the OHA itself," thereby granting this Court jurisdiction. ECF 3 at 6-7. To do this, they rely mainly on *Axon*, where the Supreme Court held that the statutory review schemes for the SEC and FTC did not preclude a district court from hearing constitutional challenges to the agency's structure without first going through that review scheme. 598 U.S. at 180. In that case, the Court looked closely at the interaction between the

11

alleged injury and the timing of review. *Id.* at 191. Plaintiffs complained that being subjected to an "unconstitutional agency authority" (namely, an allegedly improperly insulated ALJ) was in and of itself the injury, so that even if an appellate court ultimately agreed with plaintiffs on judicial review, it would have the same claim as if it had won before the agency. *Id.* In essence, "Axon . . . will lose [its] rights not to undergo the complained-of agency proceedings if [it] cannot assert those rights until the proceedings are over." *Id.* at 192. It was this reasoning, combined with the other factors, that led the Court to ultimately conclude that the district court had jurisdiction over such a claim.

Like many other agencies utilizing ALJs, HUD's review process allows for judicial review by a court of appeals after the complainant has exhausted administrative remedies (namely, seeking review by the HUD Secretary). 24 C.F.R. §§ 26.53-54. Plaintiffs argue that *Axon* should guide the Court here because the alleged harm is being subjected to an unconstitutional agency authority, which is a "here and now" injury that "cannot be undone" by the standard review process. ECF 3 at 7 (citing *Axon*, 598 U.S. at 191).

At the outset, *Axon* did not involve an Article III/Seventh Amendment challenge. The parties in *Axon* brought two constitutional claims. First, that the ALJs overseeing their cases are insufficiently accountable to the President because of the dual-layer removal protections; second, that the Federal Trade Commission unconstitutionally exercises a combination of prosecutorial and adjudicative functions. *Axon*, 598 U.S. at 183. These are both Article II claims about "subjection to an illegitimate proceeding, led by an illegitimate decisionmaker." *Id.* at 191. Plaintiffs here bring a nearly identical claim about the removal protections afforded to the HUD ALJ, but they also bring two claims related to the Seventh Amendment and Article III that the parties in *Axon* did <u>not</u> bring.

12

Plaintiffs argue that "[b]ecause both [the Seventh Amendment and Article III claims] go to the structure and essence of HUD's enforcement authority and the OHA itself," a statutory review scheme that only allows for review after the agency proceeding would not be meaningful. ECF 3 at 7. But an alleged Seventh Amendment injury does not call into question the constitutional structure of the ALJ, OHA, or HUD. Rather, it is a challenge to the specific remedy being sought. Plaintiffs' claim, relying on *Jarkesy*, is that only an Article III court, where plaintiff has a right to a jury trial, may impose a monetary penalty. Just because HUD can impose a civil monetary penalty does not mean that there will be such a penalty in every HUD proceeding, let alone the one set for June 2025. The ALJ may make a determination in favor of Plaintiffs, in which case no penalty will be assessed and there would be no Seventh Amendment or Article III violation. The ALJ could make a determination against Plaintiff, but decide to impose an equitable remedy and not to impose a monetary penalty. And if the ALJ decides against Plaintiffs and imposes a monetary penalty, that decision may be appealed to the HUD Secretary and then to the appropriate court of appeals, *see* 12 U.S.C. § 1735f-15(d)-(e), either of which could invalidate the penalty if they find merit in the constitutional claim. This could be done "without disturbing the otherwise valid administrative process—exactly as Congress intended." *YAPP USA Auto. Sys., Inc. v. NLRB*, 748 F.Supp.3d 497, 513 (E.D. Mich. 2024).

### ii.  Are the claims "wholly collateral" to the statute's review provision?

The next step in the jurisdictional analysis is to determine whether the claims raised are "wholly collateral" to the statutory review process. That is, the Court must determine if Plaintiffs' claims are focused upon HUD and OHA's "power to proceed at all, rather than actions taken in the agency proceedings." *Axon*, 598 U.S. at 192.

Plaintiffs argue that this factor requires the Court to "compare the merits of Plaintiffs' underlying constitutional claim to the substance of the charges against them." ECF 3 at 8. They asserted at oral argument that their Seventh Amendment and Article III claims have nothing to do with how HUD or OHA interpret statutes and regulations or the merits of the underlying Complaints, but rather they are saying that "OHA should not exist in the first place, we shouldn't have to answer to an ALJ who shouldn't be there, we shouldn't be subject to this proceeding and worrying about being judged by someone other than a jury." ECF 20 (Oral Argument Tr.) at 8:20-23. Because "[t]his type of relief is not regularly sought in this forum and cannot be resolved by the OHA," it must be viewed as wholly collateral. ECF 3 at 8.

This argument misses the mark on what the Seventh Amendment and Article III claims are really about. Though Plaintiffs attempt to frame these claims as structural, the claims are really an attack upon the potential remedy that the OHA ALJ might ultimately impose on them. As discussed in greater detail below, the Seventh Amendment (and, subsequently, Article III) is only implicated if the Complaints are sufficiently analogous to a suit in common law. *See Jarkesy*, 603 U.S. at 126 ("Nevertheless, the close relationship between federal securities fraud and common law fraud confirms that this action is "legal in nature." (quoting *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 53 (1989))). This includes an evaluation of the nature of the administrative proceeding and the authority of the ALJ. *Id.* at 122-24 (discussing how to determine whether a monetary remedy is a legal or equitable form of relief). Just because HUD seeks monetary relief does not mean that the ALJ is required to grant that relief if it finds in its favor. *See* 12 U.S.C. § 1735f-15(a) (stating that the civil money penalties at issue "shall be <u>in</u> <u>addition</u> to any other available civil remedy or any available criminal penalty, and <u>may</u> be imposed whether or not the Secretary imposes other administrative sanctions" (emphasis

added)). It is entirely possible for the ALJ to impose only equitable relief, or some combination of equitable and monetary relief that does not implicate the right to a jury trial — assuming the ALJ finds in HUD's favor in the first place. Plaintiffs' claims are therefore not wholly collateral at all, but are purely hypothetical at this point in time, and are nonetheless "intricately intertwined" with matters OHA will adjudicate in the agency action. *Waffle House, Inc. v. NLRB*, No. 24-6751, 2025 WL 602744 at *8 (D.S.C. Feb. 10, 2025); *see also Nexstar Media, Inc. v. NLRB*, 746 F.Supp.3d 464, 471-72 (N.D. Ohio 2024).

### iii.  Is the claim outside of the agency's area of expertise?

The third and final *Thunder Basin* factor is whether the claim falls outside of the agency's area of expertise. Plaintiffs argue that this issue is straightforward: OHA lacks the "special expertise on the interpretation and application of [the] United States Constitution, and Plaintiffs' constitutional claims do not require technical considerations of agency policy." ECF 3 at 8 (cleaned up). In support of their position, Plaintiffs point to one of HUD's filings before the ALJ in the underlying OHA proceeding, where HUD makes this same argument about the ALJ's limitation to resolve constitutional issues. *See id.* at 8-9 (citing to ECF 3-1 at 2-3).

This proposed reading of the third factor is too narrow to be practical. Taken literally, this would create a far broader exception to statutory review than the Supreme Court has ever envisioned because "most, if not all, questions of constitutional law fall outside the expertise of the administrative agencies." *Vape Central Group, LLC v. FDA*, No. 24-3354, 2025 WL 637416, at *8 (D.D.C. Feb. 27, 2025). HUD appears to acknowledge that it may be "the general rule . . . that administrative courts lack the authority or competence to rule upon constitutional issues," but this does not mean that an ALJ lacks any authority whatsoever so hear these issues. ECF 3-1 at 2 (cleaned up). In fact, "the Supreme Court has sanctioned agency review of constitutional

questions when they arise in the context of a distinct enforcement action and do not challenge the ability of the agency to act writ large." *VHS Acquisition Subsidiary No. 7 v. NLRB*, No. 24-cv-2577, 2024 WL 4817175 at *4 (D.D.C. Nov. 17, 2024), *appeal docketed*, No. 25-5021 (D.C. Cir. Feb. 5, 2025) (citing to *Elgin*, 567 U.S. at 23; *Thunder Basin*, 510 U.S. at 214-15).

Even further, the ALJ may yet determine that Plaintiffs have not improperly dispersed funds, thus obviating the need for the ALJ — or any Court — to address the constitutional issue. *See Elgin*, 567 U.S. at 22-23 (finding a lack of subject matter jurisdiction where "preliminary questions unique to the [agency] context may obviate the need to address the constitutional challenge").

## 2. MERITS ANALYSIS

Even if the Court had jurisdiction over Plaintiffs' Seventh Amendment and Article III claims, Plaintiffs would still not be entitled to injunctive and declaratory relief in this case. The Court is skeptical that the Complaints are subject to the Seventh Amendment, but even if they were they would fall under the public rights exception. Since the Article III claim is merely "the same package wrapped in different paper" as the Seventh Amendment claim, it endures the same fate. *VHS Acquisition Subsidiary No. 7*, 2024 WL 4817175 at *4; *see also YAPP USA Auto.*, 748 F.Supp.3d at 517 (rejecting plaintiff's Article III claim for the same reasons because "it appears to merely restate its Seventh Amendment claim under the guise of a separation of powers or combination of functions title").

### i. The OHA proceedings do not implicate the right to a jury trial.

The right to a jury trial in civil matters exists only if the particular statutory claim is "legal in nature," such that it sounds in common law. *Jarkesy*, 603 U.S. at 122. In evaluating whether the statutory claim is a legal one, courts should "consider the cause of action and the

16

remedy that it provides. Since some causes of action sound in both law and equity, . . . the remedy [is] the more important consideration." *Id.* at 122-23.

Plaintiffs argue that, in this case, both the cause of action and the remedy weigh in favor of finding that the Complaints are legal in nature. As to the former, they argue that the Complaints are, at their heart, about alleged breaches of contracts. Since breach of contract is a "paradigmatic private right" brought in a court of law, similarly these actions must also be brought before an Article III judge. *See* ECF 3 at 11 (citing *Granfinanciera* 492 U.S. at 55). To the extent that the Complaints could be characterized as fraud or trespass to chattel, Plaintiffs note that these are also traditional actions at law. *Id.* at 11-12. Regardless of how the cause of action is characterized, though, Plaintiffs argue that because money damages are a "prototypical common law remedy" and this fact is "all but dispositive," an Article III court is necessarily required to adjudicate the Complaints. ECF 3 at 12.

This argument takes too simple of an approach to legal rights and remedies. In fact, the Supreme Court has made clear that "[w]e need not, and do not, go so far as to say that any award of monetary relief must necessarily be legal relief." *Curtis v. Loether*, 415 U.S. 189, 196 (1974) (quotation omitted). The Seventh Amendment guarantees that in "[s]uits in common law, . . . the right of trial by jury shall be preserved." U.S. Const. amend. VII. In this context, "suits in common law" only includes those suits "which are not of equity or admiralty jurisdiction." *Jarkesy*, 603 U.S. at 122 (quotation omitted). As such, the HUD proceedings would only implicate the Seventh Amendment if the civil penalties sought are designed to punish a defendant, rather than to serve a remedial purpose or restore the status quo. *See id.* at 123. Plaintiffs argue that "[a] money penalty can be considered equitable only if its *sole* purpose is to restore the status quo." ECF 3 at 13 (emphasis in original) (citing *Austin v. United States*, 509

U.S. 602, 610 (1993)). However, this ignores the fact that the Seventh Amendment "has no application to cases where recovery of money damages is an incident to equitable relief even though damages might have been recovered in an action at law." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48 (1937).[6] Even assuming that the ALJ finds against the Plaintiffs, there are a wide range of factors to consider in deciding whether to impose a monetary penalty, and, if so, what amount to impose. *See* 24 C.F.R. § 30.80 (identifying eleven factors that must be considered); 12 U.S.C. § 1735f-15(d)(3). Some of these factors are of the kind typically determined by a jury, such as the gravity of the offense, history of prior offenses, and deterrence of future violations. *See id.*; *cf. Jarkesy*, 603 U.S. at 123-24 (identifying nearly identical statutory factors in the Securities Exchange Act and the Investment Advisers Act as "concern[ing] culpability, deterrence, and recidivism"). However, unlike the statutory factors at issue in *Jarkesy*, the factors that must be considered by a HUD ALJ are much broader. In assessing whether a civil money penalty should be imposed, and what amount, the OHA ALJ must also consider the offender's ability to pay, the injury to the public, injury to the tenants, and injury to the lot owners. *See* 24 C.F.R. § 30.80(c), (d), & (j); 12 U.S.C. § 1735f-15(d)(3). These factors are equitable ones that would not be possible for a jury to consider. When combined with the previously identified factors, it is clear that the purpose of the civil money penalty here is broader and different than the SEC money penalties evaluated in *Jarkesy*.

---

[6] Plaintiffs correctly note that the Supreme Court cited the quote from *Austin* with approval in its decision in *Jarkesy*. *See* ECF 3 at 13; *Jarkesy*, 603 U.S. at 123. However, neither *Austin* nor *Jarkesy* purport to overrule *Laughlin* on this holding. Indeed, even after the *Jarkesy* decision was issued, sister courts have cited *Laughlin*'s holding with approval. *See, e.g.*, *Nexstar Media, Inc. Group*, 746 F.Supp.3d at 471-72 (N.D. Ohio 2024); *YAPP USA Auto.*, 748 F.Supp.3d at 515 (E.D. Mich. 2024).

### ii. Even if implicated, the OHA proceedings qualify as a "public rights" exception to Article III and the Seventh Amendment.

This is not necessarily the end of the inquiry, however. Even if the right to a jury trial is implicated, the Court must still consider whether the "public rights" exception to Article III jurisdiction applies. The Supreme Court has explained that matters involving "public rights" may be properly assigned by Congress for agency adjudication without a jury, consistent with the Seventh Amendment. *Jarkesy*, 603 U.S. at 127. In order for this to happen, the statutory right must either be "closely intertwined with a federal regulatory program Congress has power to enact" and the right must either belong to or exist against the federal government. *Granfinanciera*, 492 U.S. at 54-55. "[W]hat matters is the substance of the action, not where Congress has assigned it." *Jarkesy*, 603 U.S. at 134.

Plaintiffs correctly note that the Court must start with a presumption in favor of Article III courts, because "public rights" are the exception, not the rule. ECF 3 at 14-15 (citing *Jarkesy*, 603 U.S. at 132). However, the Court is not persuaded that the Complaints simply "[a]t their core . . . allege a breach of the parties' Regulatory Agreement" and therefore sound only in common law. *Id.* at 15. This is an oversimplification of the underlying facts and how Section 537 enforcement works. Unlike the SEC scheme in *Jarkesy* which was designed to "regulate transactions between private individuals interacting in a pre-existing market," 603 U.S. at 135, Section 537 regulates a transaction between a private individual and HUD in a market specifically created by Congress in the HUD Reform Act, ECF 9 at 23. In particular, what makes Section 537 unique is that it allows HUD to step in after a violation has occurred, but before "the property ha[s] deteriorated to the point of being worthless" — in essence, before the violation would otherwise be ripe for adjudication in a common law sense. ECF 9 at 7 (quotation omitted).

If Section 537 was purely about private rights or otherwise sounded in common law only, then there would have been no need for its passage in the first place. Prior to the HUD Reform Act of 1989, HUD was severely limited in its avenues for sanctioning violators. The principal remedy was to declare the mortgage in default and debar the mortgagor, but waiting for this remedy to be ripe would allow the property to "deteriorate physically and financially, with the consequent reduction in services to tenants." *Id.* at 6 (cleaned up). Alternatively, HUD could request the Department of Justice to bring a criminal action, but not every violation warrants criminal prosecution. Statutes like the False Claims Act or the Program Fraud Civil Remedies Act might have also provided an opportunity for vindication, but only for the specific subset of violations that met the false or fraudulent nature requirements of the acts. *Id.* In the face of this "all-or-nothing" enforcement scheme, HUD requested, and Congress created, Section 537 as a unique, early enforcement mechanism that balanced the need to enforce HUD regulations while protecting tenants and the public from the ultimate harm of these violations. *Id.* at 6-7. This is precisely the kind of "self-consciously novel" regulatory scheme that the Supreme Court has previously held falls within the "public rights" exception. *Jarkesy*, 603 U.S. at 136-37; *see also Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442 (1977).[7]

---

[7] Plaintiffs' efforts to limit the application of *Atlas Roofing* fail. Contrary to their assertion, the Court in *Jarkesy* did <u>not</u> expressly overrule *Atlas Roofing*. ECF 10 at 13. In fact, the *Jarkesy* Court explicitly declined to make such a determination, despite being asked to do so by the plaintiffs in that case. 603 U.S. at 136 ("Because the public rights exception as construed in *Atlas Roofing* does not extend to these civil penalty suits for fraud, that case does not control. And for that same reason, we need not reach the suggestion made by Jarkesy and Patriot28 that *Tull* and *Granfinanciera* effectively overruled *Atlas Roofing* to the extent that case construed the public rights exception to allow the adjudication of civil penalty suits in administrative tribunals."). One footnote suggesting that a prior iteration of the Court <u>may</u> have felt that way is not enough to displace the explicit language declining to affirmatively say *Atlas Roofing* is no longer good law.

### iii.  It is unnecessary for this Court to decide whether Plaintiffs waived this right.

As a final note, the Government asserts that Plaintiffs waived their right to a jury. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848-49 (1986) (listing the right to adjudication in an Article III court as well as the right to a civil jury trial among the waivable constitutional rights). In order for a party to waive a constitutional right, that waiver must be done clearly, knowingly, and voluntarily. *See Hollings v. Methodist Healthcare, Inc.*, 474 F.3d 223, 226 (6th Cir. 2007) (citing *Fuentes v. Shevin*, 407 U.S. 67, 94-95 (1972)). Because the right to a jury trial is a fundamental right, there is a presumption against waiver. *See, e.g.*, *Brookhart v. Janis*, 384 U.S. 1, 4 (1966).

The Government primarily refers to language contained in both the POMACs and the Regulatory Agreements as the basis for their assertion. It first argues that, for the twenty-one Plaintiffs who signed POMACs, they waived their right to a jury when they acknowledged that "HUD may seek additional civil money penalties to be paid by mortgagor through personal funds for: . . . [c]ertain specific violations of the Regulatory Agreement, the penalties could be as much as $25,000 per occurrence (12 U.S.C. 1735f-15)." ECF 9 at 15-16 (quoting ECF 9-1 at 2). For ten of the remaining Plaintiffs, they allegedly waived their right to a jury when they signed the Regulatory Agreements, which state that the "[b]orrower shall comply with all applicable: laws; ordinances; regulations; requirements of any Governmental Authority . . . and Program Obligations" and defining "Program Obligations" as "all applicable statutes and any regulations issued by the Secretary pursuant thereto that apply to the Project . . . ." *See id.* at 16-17; *see also* ECF 9-17 at 7, 25. The remaining eight Plaintiffs, which have not signed a POMAC nor Regulatory Agreement, are argued to have implicitly waived their rights by participating in the program.

While it is true that there are no "magic words" required for a party to waive their constitutional rights, the waiver must be "clearly established." *Brookhart*, 384 U.S. at 4. Contrary to Plaintiffs' assertion, just because the contracts — because that's what the POMACs and Regulatory Agreements are — do not explicitly discuss waiver or constitutional rights does not mean that there was no waiver. *See* ECF 10 at 7-8. The same goes for Plaintiffs' argument that the Government's referenced clauses discuss only remedy rather than process. *See id.* It is equally incorrect, however, to assert, as the Government does, that the lack of an explicit reference to the right to a jury trial is immaterial. *See* ECF 9 at 25. The language in the POMACs, which simply identifies Section 537 by its location in the U.S. Code, would seem on its face to be insufficient to constitute a "clearly established" waiver, especially when compared with the much clearer language used in the Regulatory Agreements. Even further, while it may be technically possible to waive such a right implicitly, the Court knows of no case upholding an implicit waiver of a fundamental constitutional right.

Additionally, all of the contracts at issue here were signed well before the Supreme Court decided the *Jarkesy* case in June 2024. This weakens the Government's argument that, by signing these contracts, Plaintiffs knowingly waived their right to a jury trial on the issue of monetary penalties. After all, how could they have knowingly waived a right that no court had established that they had? For the Plaintiffs alleged to have waived their right implicitly through participation in the program, the Government's argument is even weaker.

Determining whether these provisions would apply to the right to a jury trial is a matter of state contract law; the subsequent determination of whether this waiver was given clearly, knowingly, and voluntarily is a matter of federal law. *See, e.g.*, *Vibo Corp., Inc. v. Conway*, 594 F.Supp.2d 758, 780-85 (W.D. Ky. 2009) (first applying principles of contract law to determine

the scope of the alleged waive, then applying federal law to determine the validity of the waiver). Doing this for all thirty-nine Plaintiffs, split into three general groups, would involve a lengthy, intensive analysis that will almost certainly result in the conclusion that some, if not all of the Plaintiffs, did not waive their right to a jury trial. Since this Court can, and has, resolved the jury trial question on multiple other grounds, though, it is unnecessary for the Court to conduct this analysis.

## B. ARTICLE II CLAIM

### 1. SUBJECT-MATTER JURISDICTION

Unlike with Plaintiffs' other constitutional complaints, this Court does have subject-matter jurisdiction over the Article II claim. The Government does not contest this, and for good reason: the Supreme Court held only two years ago in *Axon* that federal district courts have jurisdiction to adjudicate "constitutional challenges to the [agency's] structure," including challenges to removal restrictions. 598 U.S. at 180.

### 2. MERITS ANALYSIS

#### i. HUD ALJs are inferior officers who exercise no policymaking duties, and, as such, do not impair the president's executive powers.

The Supreme Court over the past several decades has decided numerous cases discussing the Executive's appointment and removal powers. These cases make clear that, while these powers are broad and far-reaching, they are not a "one size fits all" approach. The president's appointment powers are subject to the plain language of the Appointments Clause, U.S. CONST. art. II, § 2, cl. 2, but the president's removal powers are inferred from this language and other clauses in the Constitution. *See id.* § 1, cl. 1 ("Vesting Clause"); *id.* § 3 ("Take Care Clause"). As such, the extent of the president's removal powers depends on who they are being applied to. That is, what prerequisites must be satisfied for a president to properly remove an individual

23

from their role at an executive agency varies based on the type of role and extent of that role's duties.

There are three general classifications of people who work for the Executive: principal officers; inferior officers; and employees. *See Morrison v. Olson*, 487 U.S. 654, 670-71 (1988) (explaining that the Appointments Clause divides "Officers" into two classes: principal officers appointed by the President with Senate consent, and inferior officers whose appointment Congress may vest elsewhere); *Buckley v. Valeo*, 424 U.S. 1, 125-26 & n.162 (1976) (differentiating "Officers of the United States," who exercise "significant authority" and must be appointed under the Appointments Clause, from "lesser functionaries" or employees). Both parties here agree that HUD ALJs are properly considered to be inferior officers. ECF 21 at 10-11; ECF 22 at 5. It is also uncontested that HUD ALJs are properly appointed to their roles, ECF 21 at 10; ECF 22 at 7 (("Government asserted that "Plaintiffs seem to assert a second, independent argument" that the HUD ALJs appointment as inferior officers is incompatible with the Appointments Clause . . . Plaintiffs make no such contention"). (citation omitted)), and may only be removed "by the agency in which the [ALJ] is employed only for good cause established and determined" by the Merit Systems Protection Board ("MSPB"), 5 U.S.C. § 7521(a); *see also* ECF 18 at 10; ECF 21 at 13. In turn, MSPB members are also only subject to for-cause removal. 5 U.S.C. § 1202(d). The question, then, is whether this "dual-level removal protection" for HUD ALJs is unconstitutional.

Precedent directs the Court to start at the presumption that officers, principal or inferior, should be removable by the President "at will." *See Myers v. United States*, 272 U.S. 52, 117, 163-64 (1926); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 214-15 (2020). As case law has developed over the last several decades, the Supreme Court has come to identify

24

two general exceptions to the President's unrestricted removal power: (1) expert bodies with multiple members, and (2) inferior officers with limited duties and no policymaking or administrative authority. *Seila Law*, 591 U.S. at 203-04. HUD ALJs are clearly not operating as a multi-member expert body, so the question is whether they fall within that second exception. In discussing the role of a specially appointed independent counsel, the Supreme Court in *Morrison* upheld statutory removal protections for inferior officers performing adjudicative functions, emphasizing that such protections do not impermissibly interfere with presidential authority when they preserve independence in limited roles. 487 U.S. at 671-672.

With the APA's enactment in 1946, Congress authorized removal protections for ALJs to safeguard adjudicative neutrality. *See* Administrative Procedure Act, Pub. L. No. 79-454 § 11, 60 Stat. 237, 244 (1946) (amended in relevant part 1978). As Congress has subsequently created new agencies and departments, it has provided these executive bodies the freedom to decide how, exactly, they choose to utilize ALJs. *See* 5 U.S.C. § 3105 (effective 1966) (amended 1978). Beginning with the Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 1202(d), attempted for-cause removals of any ALJ was required to be approved by the MSPB after an opportunity for a hearing on the matter. 5 U.S.C. § 7521. The Supreme Court has been asked on numerous occasions since then to rule on whether or not these protections, as applied across the board to all ALJs within the Executive Branch, are constitutional, and has continuously declined to do so. *See, e.g.*, *Free Enter. Fund*, 561 U.S. 507 n.10 ("For similar reasons, our holding also does not address that subset of independent agency employees who serve as administrative law judges. . . . And unlike members of the Board, many administrative law judges of course perform adjudicative rather than enforcement or policymaking functions . . . or possess purely recommendatory powers."); *Lucia v. SEC*, 585 U.S. 237, 244 n.1 (2018) (specifically declining

to rule on the constitutionality of statutory restrictions on ALJ removal, despite being asked to do so by the Government twice); *Jarkesy*, 603 U.S. at 121 (choosing only to resolve the case on the jury trial question, and declining to address the nondelegation or removal issues).

Plaintiffs argue that the Supreme Court's determination in *Free Enterprise* necessarily dictates the outcome here. ECF 18 at 3. In that case, the Supreme Court held that the dual-layer removal protections for members of the Public Company Accounting Oversight Board ("PCAOB"), who were inferior officers appointed by members of the SEC, were unconstitutional. *Free Enter. Fund*, 561 U.S. at 484. Contrary to Plaintiffs suggestion, though, this case does <u>not</u> represent a blanket prohibition on two layers of removal protections for inferior officers. *See* ECF 18 at 3. The question posed, and answered, by the Supreme Court was whether "the President [may] be restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer, <u>even though that inferior officer determines the policy and enforces the laws of the United States</u>." *Free Enter. Fund*, 561 U.S. at 483-84 (emphasis added). Plaintiffs' proposed interpretation would have this Court stop reading halfway through the question, and ignore the latter half qualifying the specific type of inferior officer at issue. In fact, the Supreme Court explicitly <u>excluded ALJs from their determination</u>, noting that "unlike members of the [PCAOB], many administrative law judges of course perform adjudicative rather than enforcement or policymaking functions . . . or possess purely recommendatory powers." *Id.* at 507 n.10.

The only support Plaintiffs provide for their assertion that HUD ALJs are more akin to members of the PCAOB than the ALJs excluded from that decision comes from the Supreme Court's determination in *Lucia*, 585 U.S. 237 (2018). *See* ECF 18 at 2-3 & n.2; ECF 22 at 9-10. However, the Supreme Court's treatment of SEC ALJs in *Lucia* is only relevant insofar as the

question was whether the ALJs were properly classified as "lesser employees" not subject to the Appointments Clause (and therefore could be appointed by ordinary staff members), or if the ALJs are "inferior officers" who must be appointed either by the President, an Article III court, or a Department Head. *Lucia*, 585 U.S. at 244-25. At no point did the Court address the question of supervision and removal protections; in fact, the Supreme Court declined explicitly to do so at both the certiorari and merits stages, despite the Government asking the Court to answer this question. *Lucia*, 585 U.S. at 244 n.1. Since there is no debate in this case that HUD ALJs are inferior officers who have been properly appointed under the Appointments Clause, any other characterizations of SEC ALJs by the Supreme Court in *Lucia* are irrelevant here. *See* ECF 18 at 3 n.1 ("HUD ALJs are likewise inferior officers."); ECF 21 at 11 ("By contrast . . . HUD ALJs are "inferior officers.").

The differences between the powers of the PCAOB members and HUD ALJs are stark. Prior to *Free Enterprise*, the PCAOB "promulgate[d] auditing and ethics standards, perform[ed] routine inspections of all accounting firms, demand[ed] documents and testimony, and initiate[ed] formal investigations and disciplinary proceedings" — all possible without direct action or interference by the SEC. *Free Enter. Fund*, 561 U.S. at 485 (citing 15 U.S.C. §§ 7213-15 (2006 ed. and Supp. II)). And for some of these actions, such as new rules, the SEC was required to approve them unless the SEC found the rule to be inconsistent with applicable law. *See, e.g.*, 15 U.S.C. § 7217(b)(3) (2009 ed.) ("The Commission <u>shall</u> approve a proposed rule, if it finds that the rule is consistent with the requirements of this Act and the securities laws, or is necessary or appropriate in the public interest or for the protection of investors.") (emphasis added).

This is not the case with HUD ALJs. For starters, HUD ALJs exist solely to preside over hearings conducted in accordance with the APA, *see* 24 C.F.R. § 26.2 (requiring that hearings at HUD be presided over by an ALJ); 5 U.S.C. § 556, and only on matters assigned to them by the HUD Secretary, *see* 24 C.F.R. § 20.5 (noting that OHA's jurisdiction is limited to "matters assigned to it by the Secretary or designee"). Additionally, the HUD Secretary has the ability to review and modify any and every determination made by a HUD ALJ. *See* 24 C.F.R. §§ 26.26, 26.52 (allowing for Secretarial review of all ALJ determinations, except for nonprocurement debarment and suspension proceedings that follow separate OMB government-wide guidance). In fact, some ALJ determinations are <u>required</u> to be reviewed by the Secretary before they can become a final agency action — including the potential ALJ decision after the OHA hearing in this case. *See*, *e.g.*, 24 C.F.R. § 180.680(c) (noting that when the ALJ's initial decision provides for "the suspension or termination of, or the refusal to grant or continue, Federal financial assistance, or the imposition of any other sanction," the decision "shall not constitute an order or final agency action until approved by the Secretary."). In other words, a political appointee, the HUD Secretary, has the authority to modify or reverse any decision the ALJ makes in this case.

Plaintiffs attempt to explain this away by claiming that "[p]roper supervision requires both review authority and removal power." ECF 22 at 7. Therefore, they argue, it is insufficient just to have HUD ALJ determinations subject to Secretarial review. Instead, Plaintiffs suggest that their claim is actually about HUD ALJs "wielding executive power without the requisite accountability to the chief executive because of their removal protections." *Id.* at 8. But this misunderstands the reasoning behind removal powers in the first place. Ultimately, it is the President who is responsible for the Executive Branch, so the branch's officers "must remain accountable to the President, whose authority they wield." *Seila Law*, 591 U.S. at 213. This can

be accomplished by the officer either reporting directly to the President, such as a principal officer, or by being accountable to a principal officer subject to at-will removal. *See id.* at 213-18 (describing the development of the contours of Presidential removal powers). This is precisely where the PCAOB ran into trouble in *Free Enterprise*, as neither PCAOB members nor SEC Commissioners were removable at-will. *See* 561 U.S. at 495. Conversely, it is clear that HUD ALJs are directly accountable to the HUD Secretary, who does not enjoy removal protections. Not only are ALJ determinations reviewable by the Secretary, as already discussed, but the Secretary is the individual responsible for whether an ALJ can adjudicate anything at all by deciding whether or not to bring a complaint. *See* 24 C.F.R. §§ 30.70, 30.85. It was the Secretary, not the ALJ, who directed the filing of the Complaints against Plaintiffs. The Secretary also makes the decision to whom to assign a given complaint. *See* 24 C.F.R. § 26.2 (defining a hearing officer as an ALJ "authorized by the Secretary or designee to conduct proceedings"). And there is no debate that the HUD Secretary is sufficiently accountable to the President; after all, the President is the one who appointed the HUD Secretary and directs what policies the Secretary should implement and enforce. There is nothing stopping the President from directing the HUD Secretary, for example, to stop pursuing complaints under Section 537, or to dismiss the Complaints against the Millennia Companies. If the Secretary does not follow that direction, then the President may replace the Secretary at his whim.

With this all in mind, this Court holds that the removal protections for HUD ALJs are constitutional. They do not violate separation of powers or impermissibly interfere with the President's control of the Executive Branch.

### ii. Even if the HUD ALJs were improperly insulated from removal, Plaintiffs have not identified a cognizable harm under *Collins* that entitles them to relief.

Even if HUD ALJ removal protections were unconstitutional, that would still not automatically entitle Plaintiffs to the relief they request. The Supreme Court clarified in *Collins v. Yellen* that an unconstitutional removal provision, standing alone, does not establish a basis for compensable relief. 594 U.S., 220, 258-59 (2021). To obtain relief, a plaintiff must show a causal connection between the unconstitutional provision and a concrete injury. *Id.* at 257-60. That is, Plaintiffs would have to prove that the unconstitutional removal restrictions caused them harm.

Plaintiffs attempt first to distinguish *Collins*, arguing that *Collins* is only applicable to retrospective relief. Here, however, "Plaintiffs are not challenging an order by the ALJ or a particular ruling" but rather "challenge the authority of HUD [ALJs] to act in the first instance." ECF 22 at 3. The Sixth Circuit has already squarely addressed this question and held that the distinction between prospective and retrospective relief "does not matter here." *Calcutt v. FDIC*, 37 F.4th 293, 316 (6th Cir. 2022), *rev'd on other grounds,* 598 U.S. 623 (2023) (per curiam). Several other circuits have reached similar conclusions. *See*, *infra*, note 8; *see also CFPB v. Law Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 180-81 (2d Cir. 2023) (declining to read "*Collins* so narrowly" as to only apply to claims for retrospective, and not prospective, relief), *cert. denied*, ––– U.S. ––––, 144 S. Ct. 2579 (2024); *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 631 (5th Cir. 2022) ("*Collins* did not rest on a distinction between prospective and retrospective relief."), *rev'd and remanded on other gro*unds, 601 U.S. 416 (2024). What matters is "whether a 'harm' occurred that would create an entitlement to a remedy, rather than the nature of the remedy" and the "determination as to whether an unconstitutional removal protection 'inflicted harm' remains the same whether the petitioner seeks retrospective or prospective relief." *Calcutt*, 37 F.4th at 316. (citation omitted).

30

Plaintiffs next try to argue that they have, in fact, suffered a compensable harm as defined by *Collins*. While there is not a clear rule for what does and does not constitute a compensable harm stemming from a removal restriction, the Supreme Court has suggested that where "the President had attempted to remove [the officer] but was prevented from doing so by a lower court decision holding that he did not have 'cause' for removal," or where "the President had made a public statement expressing displeasure with actions taken by [the officer] and had asserted that he would remove [the officer] if the statute did not stand in the way" there would be compensable harm. *Collins*, 594 U.S. at 259-60. The Sixth Circuit also suggested that a plaintiff could show harm by demonstrating that the removal restriction "prevent[ed] superior officers from removing [an inferior officer] when they attempted to do so" or possibly by showing that the restriction "alter[ed] the [inferior officer]'s behavior." *Calcutt*, 37 F.4th at 316.

Plaintiffs attempt to demonstrate the harm the HUD ALJ removal restrictions have caused them by referencing broad statements from President Trump about the size of the federal workforce, including HUD, and noting that HUD has launched an internal task force to review how it is spending taxpayer dollars. ECF 18 at 9-10. However, "vague, generalized allegations" are not enough. *Calcutt*, 37 F.4th at 317. The aggrieved party must do more than suggest the mere possibility that harm may have occurred. To allow a party to suggest otherwise "would effectively eliminate any need to show that unconstitutional removal protections caused harm, because a petitioner could always assert a possibility that an agency with different personnel might have acted differently." *Id.* That other district courts in this country have found such vague suggestions, or even just the existence of an unconstitutional removal restriction, sufficient to show compensable harm does not change the framework under which this Court must decide this case. *See* ECF 18 at 6-7 (collecting cases from district courts outside the Sixth Circuit).

31

This Court is bound by the standard established by the Sixth Circuit in *Calcutt*. At the end of the day, there is no evidence that President Trump or HUD Secretary Turner "have attempted to remove ALJ Fernández-Pons from his position, much less that either was frustrated from doing so by any statutory provision; neither has stated that he wants to remove ALJ Fernández-Pons; nor has either made any public statement expressing displeasure with actions taken by ALJ Fernández-Pons." ECF 21 at 5; *see also* ECF 17 at ¶¶ 79-81.

As a last resort, Plaintiffs argue that the alleged constitutional violation in and of itself is a compensable harm. Plaintiffs assert that because the Supreme Court identified a challenge to removal protections as a "here and now" injury for jurisdictional purposes in *Axon*, it must also be viewed as an injury at the merits stage of analysis. *See, e.g.*, ECF 18 at 8. To do anything otherwise, Plaintiffs allege, would be "nothing short of doublethink." ECF 22 at 1. Contrary to Plaintiffs' arguments, the Supreme Court's holding in *Axon* does not *ipso facto* satisfy this requirement. Plaintiffs cite to a handful of district court cases from the Fifth and Eleventh Circuits that recently found to the contrary. *See* ECF 18 at 6-7 (collecting cases). However, like its sister district court in *YAPP USA Auto.*, this Court finds these cases unpersuasive in their attempts to explain why *Collins*' harm standard does not apply or is "readily met." *See YAPP USA Auto.*, 748 F.Supp.3d at 511 n.5 (E.D. Mich. 2024).

While *Axon* may have identified a structural constitutional challenge as a "here-and-now" injury at the jurisdictional stage, that does not automatically translate to the summary judgment and permanent injunction stage. The Supreme Court's analysis in *Axon* centered on understanding the plaintiffs' challenges through a review of the *Thunder Basin* factors, which do not consider relief or the irreparable injury standard required for permanent injunctions (such as the one sought here). Instead, the "here-and-now" injury language comes from the Supreme

Court's analysis in *Seila Law*, which concerned standing — another threshold issue similar to jurisdiction. This distinction was key when the Supreme Court made its determination on the harm requirement in *Collins*, emphasizing that it "should not be misunderstood as a holding on a party's entitlement to relief based on an unconstitutional removal restriction." *Collins*, 594 U.S. at 258 n.24. "Otherwise, the Supreme Court's limited jurisdictional holding in *Axon* . . . would be converted into a broad ruling that creates an entitlement on the merits to a[n] . . . injunction in every case where such constitutional challenges are raised." *Leachco*, 103 F.4th at 759. Such an interpretation would fly in the face of "the Supreme Court's words of caution when interpreting the same 'here-and-now injury' language from *Axon*;" this Court will "not misunderstand what was said about jurisdiction in *Axon* 'as a holding on a party's entitlement to relief based on an unconstitutional removal provision.'" *Id.* (quoting *Collins*, 594 U.S. at 258 n.24).

Regardless of how this Court views the reasoning of other district courts on this matter, it does not change the fact that the Sixth Circuit has already directly addressed this question and plainly held that "*Axon* did not overrule *Collins* — or, by extension, *Calcutt*." *YAPP USA Auto. Sys., Inc. v. NLRB*, No. 24-1754, 2024 WL 4489598 at *3 (6th Cir. Oct 13, 2024).[8] As such, this Court is bound by the Sixth Circuit's decisions in *YAPP USA Auto.* and, subsequently, *Calcutt*. Plaintiffs in this Court are required to establish that the allegedly unlawful removal restrictions actually caused them harm, which they have not done.

---

[8] Plaintiffs correctly point out that while unpublished decisions in this circuit may be instructive, they do not carry any independent precedential weight. *See* ECF 22 at 3 (citing *Crump v. Lafler*, 657 F.3d 393, 405 (6th Cir. 2011)). However, since the *Axon* decision was issued in April 2023, multiple district courts and appellate courts across the country have agreed with *Calcutt*'s holding that *Collins* applies to prospective relief. *See, e.g.*, *Bhatti v. Fed. Housing Fin. Agency*, 97 F.4th 556, 561 (8th Cir. 2024); *Leachco, Inc. v. Conumer. Prod. Safety Comm'n*, 103 F.4th 748, 757 (10th Cir. 2024) (collecting cases); *NLRB v. Starbucks Corp.*, 125 F.4th 78, 88-89 (3d Cir. 2024) (collecting cases). Accordingly, this Court continues to be persuaded that *Calcutt* is still good law on this matter.

## IV. CONCLUSION

As detailed above, Plaintiffs have failed to prove their claims of Article II, Article III, or Seventh Amendment constitutional violations, and Plaintiffs are not entitled to the extraordinary relief of enjoining the underlying proceedings at OHA. Their request for a permanent injunction is DENIED. For the same reasons, Plaintiffs' request for declaratory relief is also DENIED. As there are no disputed material facts, *see* ECF 17, and based on the foregoing, the Court GRANTS summary judgment in favor of the Government on all claims.

**IT IS SO ORDERED.**


Dated: April 28, 2025                    */s/ Dan Aaron Polster*
                                        United States District Judge